**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**FRUIN–COLNON CONSTRUCTION CO. and Utah Construction and Mining Co., a Joint Venture, Respondents.**

**No. 17390.**

United States Court of Appeals
Eighth Circuit.

April 24, 1964.

Alfred Brummel, Atty., N.L.R.B., Washington, D. C., made argument for petitioner and filed brief with Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Warren M. Davison, Atty., N.L.R.B., Washington, D. C.

Mark R. Gale, St. Louis, Mo., made argument for respondent and filed brief with Ralph Edwards and Greensfelder, Hemker & Wiese, St. Louis, Mo.

Before VAN OOSTERHOUT, MATTHES and MEHAFFY, Circuit Judges.

MEHAFFY, Circuit Judge.

This is a petition by the National Labor Relations Board pursuant to § 10(e) of the National Labor Relations Act (29 U.S.C.A. § 141 et seq.) for enforcement of its decision and order (139 N.L.R.B. 894) arising from alleged unfair labor practices committed by respondent, Fruin-Colnon Construction Co., a Missouri corporation, and Utah Construction and Mining Co., a Delaware corporation, engaged as joint venturers in the interstate business of construction of a hydroelectric project in Missouri for a utility company operating therein.

The facts and findings of the Trial Examiner, adopted by the Board, but contested in main by respondent as unsubstantiated by the evidence, are summarized most favorably to petitioner as follows.

The project's plan of construction entailed fabrication of a fifty-five acre, dike-enclosed reservoir atop a mountain, in the basin of which a shaft, 450 feet deep and 27 feet in diameter, was being dug to connect with a tunnel bored almost the entire length up the mountainside, the lower outlet of which emptied into a second reservoir at the foot of the mountain. A powerhouse integrated with the "shaft-tunnel" conduit between the two reservoirs was designed to generate additional electricity when needed from water circulated between the two reservoirs.

At the time of their asserted wrongful discharge by respondent, the four, complaining rank-and-file miners, Lanham, Gailey, Bess and Upchurch plus miner Williams and Foreman Fitzgerald comprised one of three eight-hour shifts assigned to continuous work on the shaft.[1] It was the task of these miners to enlarge the entire length of the proposed shaft commencing at the opening on top of the mountain and proceeding downward by expanding to the specified 27 foot diameter the previously mined pilot hole, which varied in width from eight to twelve feet. Simultaneously, the walls or dikes of the upper reservoir were being constructed in the area adjacent to the mouth of the shaft by trucks dumping fill from the leveled mountaintop and sluicing it with high pressured water pumps into compacted pyramidal embankments.

On the morning of November 8, 1961 at 7:00 a. m., Foreman Fitzgerald and his five man crew reported for work at the mouth of the shaft. According to practice, the preceding shift was hoisted by crane from their work in the shaft below to the surface in their cable-attached, double-decked, hexagonal platform especially constructed for this operation, and sometimes referred to by the miners as the "cage".[2] The relieved miners, appearing "wetter" and "dirtier than usual", remarked to the men in Fitzgerald's crew that "it was awful rough down there". One of the miners in Fitzgerald's crew testified he observed a rock roll down the nearby embankment where the sluicing operation was being conducted and strike the crane located behind a

1. The alleged discriminatees were subject to a collective bargaining agreement between respondent and Local 916, International Hod Carriers, Building and Common Laborers Union, AFL-CIO, affiliated with Eastern Missouri Laborers' District Council.

2. Although the Trial Examiner found the cage's lower deck to measure ten feet on a side, a blueprint depicting the cage's design and dimensions establishes that the sides of the upper deck were ten feet in length while the sides of the lower deck, shorter in perimeter, were in fact only eight feet, four inches each.

chain-link, retaining fence encircling the collar of the mouth of the shaft.[3] Fitzgerald and his crew boarded the cage and were lowered 125 feet down into the shaft to the enlarged ledge surrounding and sloping inward at a 35° to 45° angle towards the pilot hole which marked the progress of the hole's expansion to date. After dismounting from the top deck of the cage via ladder to the ledge, positioning the base of the cage over the pilot hole to protect to the extent possible from falling into it, and unloading their equipment from the lower deck, the men commenced the enlargement process where the prior shift had left off. In accordance with the standard operating procedure, two of the miners manned the air hose gun blowing the loose, uncleared debris and rock from a previous dynamite blast into the pilot hole, while two other miners attempted to drill holes in the shaft's floor for insertion of explosives to be detonated after the crew's subsequent removal from the shaft. The remaining miner tried to paint a line designating the intended outer perimeter of the shaft's desired width, but water seeping and flowing in rivulets about the size of one's little finger from fissures in the shaft's walls obliterated his efforts. The approximate outside temperature on this morning was 29° F., recorded mechanically by a thermograph machine operating continuously at the jobsite. The effect of the colder temperature outside the shaft was to create a strong updraft through the pilot hole. This updraft would strike the bottom of the cage, positioned over the pilot hole, and spray onto the ledge, mixing with loose material from the blowing operation and forming a mud-laden mist which got into the miners' eyes hampering their vision. The floor of the ledge was partially covered by deposits of a thin, concrete material called gunite which had fallen on November 6, 1961, during the last application to cy-

clone fencing bolted to the walls of the overhead, enlarged shaft as a precaution against loose rocks falling on the miners below. Seepage water on the gunite deposits on the floor of the ledge were found to have made the miners' footing slippery.

A combination of these conditions which several of the crew complained was impeding the progress of their work prompted one of the miners to request of Foreman Fitzgerald that he discontinue operations in the shaft and transfer the crew to work in the tunnel. Although Fitzgerald concurred in the disagreeableness of the working conditions, he expressed his lack of authority precluded his granting the request. However, he offered to temporarily suspend work, return with the crew to the surface, and communicate the men's request to Superintendent Finlay, reminding them that as a supervisor he would have to remain neutral. Reaching the surface in the cage with his crew about one hour after the day shift had begun work, Foreman Fitzgerald located Superintendent Finlay and informed him of his men's complaints and their request to be transferred to work in the tunnel. Finlay replied that he had no other work for the men except in the shaft. Upon learning of Finlay's decision, the four discriminatees standing nearby, excluding miner Williams, approached Finlay personally pursuing their protest with him over asserted unsafe working conditions in the shaft. They insisted that Finlay either transfer them to work in the tunnel or halt the sluicing operation on the nearby embankments before they would return to work in the shaft. Finlay reiterated his position that the only work for them was in the shaft, and when they refused to resume its performance under the existent conditions he chastised them for lack of manly ability. One of the complainants then berated Finlay for questioning their

3. The four discriminatees testified that Foreman Fitzgerald and Superintendent Finlay made an approval inspection of the conditions in the shaft in the cage prior to their crew's descent. While both supervisors deny this occurrence, the Trial Examiner declined resolution of this conflict in the testimony as unnecessary to his findings.

manhood, challenging him to a fight which the latter declined. The dispute was concluded on the note that the four miners, although refusing to return to work, announced they were not quitting and Finlay responding that he was not firing them.[4] Nevertheless, two of the four miners turned in their equipment consisting of a miner's metal helmet, rain suit, safety boots and harness to the company supply room rather than leaving their issued apparel in the change building as was customary. The four miners, excepting Williams and Foreman Fitzgerald, proceeded to the bottom of the mountain in search of respondent's safety director, but failing to locate him left the construction area and returned to their homes.

Williams and Fitzgerald were sent by Finlay to work in the tunnel, but later they returned to accomplish as much work as possible in the shaft until their normal shift expired at 3:00 p. m., the time for their relief by the swing shift. During the interim Finlay, Palmer and Union Steward Swaringin made an inspection of the shaft atop the second deck of the cage. Only the union steward concluded that conditions therein were unsafe for work.

The swing shift worked in the shaft from 3:00 p. m. November 8 until 11:00 p. m. performing normal enlargement operations, despite the presence of considerable water in the shaft from the sluicing operation on the reservoir embankments above. Subsequently they were relieved by the graveyard shift which continued the work until November 9 at 7:00 a. m., the time for Fitzgerald's day shift to report. Only Fitz-

gerald and Williams reported for work. They resumed operations by themselves in the shaft for about one hour when they were notified that four new miners had been employed. They enlisted the four new men and returned to the shaft to continue the work until the end of the shift.[5] This shift's work progress report also noted the entry of water into the shaft's mouth from the sluicing operation.

Before the swing shift on November 9 entered the shaft, Finlay observed sluice water flowing into the mouth of the shaft in sufficient force to dislodge a workman below, and discontinued shaft operations after being advised by the project superintendent that the completion of the upper reservoir had priority. The shaft crews were transferred to work in the tunnel until December 18, 1961, when the work on the shaft was resumed and ultimately completed January 29, 1962.

On Monday, November 13, 1961, respondent's representatives met with the four alleged discriminatees who, accompanied by their union representative, requested reinstatement. The respondent maintained that the four miners had quit and thereby permanently severed their employment status with respondent. They were never rehired. Subsequently one of the alleged discriminatees filed charges with the Board alleging separate violations of Sections 8(a) (1) and 8(a) (3) of the Act, supra.[6] The Board adopted the Trial Examiner's finding that the respondent unlawfully discharged the four miners for engaging in the walkout on November 8, which constituted participation in protected concerted activity in good faith protest of abnormally dan-

4. The evidence showed that subsequently on that same day, the respondent submitted separation slips for the four employees to its payroll department noting thereon "quit" as the reason for termination of pay. Also on that same afternoon, one of these employees informed an unemployed neighbor of the availability of jobs with respondent.

5. One of the new employees quit at the end of one day's work, but the record is silent as to his reason.

6. The Trial Examiner and Board concurred in dismissing the 8(a) (3) charge on grounds there was no evidence indicating any anti-union animus motivating the respondent in its discharge of the four discriminatees which, in turn, did not encourage or discourage membership in a labor organization within the proscription of this section of the Act.

gerous working conditions under Sections 502 and 8(a) (1) of the Act,[7] and, therefore, not a strike in contravention of the "no-strike" clause in their collective bargaining agreement.

The Board's fundamental finding that the walkout was within the realm of protected concerted activity immunizing the employees from discharge for engagement therein is grounded on agreement with the Trial Examiner that working conditions on the day in question had become "abnormally dangerous" as a "consequence of three new elements: (1) the construction of the dike or wall of the reservoir had progressed to within twenty feet from the mouth of the shaft; (2) a final application of gunite had been blown onto the sides of the shaft on November 6 and there had been no work done on the floor of the shaft since then; (3) the temperature had dropped on the morning of November 8 to 29°, the lowest yet encountered" presenting "new dangers which had not been present before that date". The Board theorized these conditions abnormally enhanced the possible danger of a miner working on the ledge of the shaft falling into one of several gaps between the sides of the cage and the pilot hole because of the (1) likelihood of dumped rocks and water from the sluicing above falling into the shaft's mouth and injuring or dislodging a workman on the ledge below, or (2) the loss of footing with the same disastrous consequence caused by the slipperiness of the wet, hardened gunite floor and impaired vision due to the mud-laden spray from the increased updraft.

While respondent raises numerous arguments against enforcement of the instant petition, its attack upon the substantiality of the evidence supporting the finding "abnormally dangerous working conditions" existed on the day the walkout occurred goes to the heart of the question concerning the protectivity of the four complaining employees' actions and will, therefore, receive our prime consideration.[8]

█ █ ██ Since the Supreme Court's construction in Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951), of that portion of Section 10(e) of the Act which states, "The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive" (29 U.S.C.A. § 160), our duty as a reviewing tribunal of the Board's evidentiary findings has been unmistakably clarified. Speaking for the court in Universal Camera, Justice Frankfurter ruled that courts of appeal in testing the Board's conclusionary findings by the statute's substantiality yardstick, were obliged to examine the entire record and consider whatever evidence contradicts or fairly detracts from the weight of the evidence held supportive of the challenged findings. While this Court respects the prerogative of the

7.  Section 502 (29 U.S.C.A. § 143) provides in part, "nor shall the quitting of labor by an employee or employees in good faith because of abnormally dangerous conditions for work at the place of employment of such employee or employees be deemed a strike" under the Act, while Section 8(a) (1), *inter alia*, makes it an unfair labor practice for an employer to interfere with, restrain, or coerce employees in the exercise of their right to engage in concerted activity for the purpose of mutual aid or protection (29 U.S.C.A. §§ 157 and 158).

8.  Respondent also contended: (1) The timely replacement of the alleged discriminatees and dismissal of their grievance by the Union pursuant to the procedures of the collective bargaining agreement precluded the Board from taking jurisdiction on grounds no labor dispute burdening or obstructing the free flow of commerce existed as defined under Section 1 of the Act (29 U.S.C.A. § 142); (2) it was deprived of a fair, full and impartial adjudication of the charges under the Fifth Amendment to the Constitution of the United States due to the Board's denial of its discovery requests and the Trial Examiner's bias conduction of the hearing; (3) the employees voluntarily quit their jobs and were replaced, not discharged by respondent; and (4) Section 502 of the Act is concerned with individual, not concerted, activities as involved in the instant walkout.

trier of fact in an unfair labor practice case to resolve issues of the witnesses' credibility in arriving at a decision based thereon, e. g. N. L. R. B. v. Morrison Cafeteria Co. of Little Rock, Inc., 311 F.2d 514 (8th Cir. 1963), we cannot avoid our greater responsibility under Universal Camera to fairly weigh against the Board's findings the countervailing evidence independent of and consistent with its credibility determinations. N. L. R. B. v. International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers, Local No. 83, AFL–CIO, 321 F.2d 807 (8th Cir. 1963); Gem International, Inc. v. N. L. R. B., 321 F.2d 626 (8th Cir. 1963).

Uncontroverted documentary evidence in the record conclusively demonstrates that the thermograph machine, the credibility of which no one disputes, recorded temperatures as low as 25° and 28°, respectively, during the early morning hours of the day shift on the two days preceding the walkout. Contrary to the Examiner's finding that the 29° temperature on the morning of the walkout was "the lowest yet encountered", these colder readings which produced a more intense updraft indicate the discriminatees underwent their undoubtedly more adverse effect on their working conditions without complaining of any abnormality.

The Examiner deduced from credited testimony and a photograph picturing a concrete truck backed up to a gunite machine parked on the collar of the shaft's mouth that the latest application of the cement substance prior to the November 8 walkout occurred on November 6 with no intervening work on the shaft's floor to reduce its slippery effect on the miners' footing. The documented work progress report of the crew which immediately preceded the discriminatees' shift on November 8 undeniably establishes that work on the shaft's floor included drilling for a period of one and one-half hours. Furthermore, the discriminatees had worked in the shaft without protest on the November 7th day shift when any hardened gunite on the floor of their work area would have been fresher from its final application on November 6. The subsequent drilling on November 8 by the crew preceding the day shift undoubtedly improved the footing on the shaft's ledge and at the very least, eliminated any unusually dangerous condition heretofore presented by the new layer of gunite.

From this same photograph, found to have been made no later than November 6, which also depicts the relative distance from the base of the nearby embankment to the shaft's mouth, the Examiner inferred that the continuous sluicing operation above moved the base to within twenty feet thereof by November 8 as testified to by miner Lanham, one of the credited discriminatees. Close inspection of this photograph, keeping in mind the undisputed dimensions of the pictured equipment and their location, visually demonstrates to even an unfamiliar eye that the base of the nearly completed embankment was substantially more than twice the distance from the mouth of the shaft than the twenty foot estimate of witness Lanham. Moreover, Lanham's credited testimony places the sluicing operation some 75 feet up the incline on the existing level of the embankment. There is no direct evidence that the fill, dumped and compacted by water on the embankment's top, enlarged the dike's base in the direction of the shaft's mouth between the time the photograph was taken on or about November 6 and November 8, the day of the walkout. In fact, there is testimony this photograph represents conditions as they still existed when the walkout occurred. The Examiner's inference of the embankment's proximity to the mouth of the shaft on November 8, essential to his finding of increased danger to those below from falling rocks, does not comport with substantial evidence of the physical facts. Furthermore, Lanham's statement he observed a rock roll down from the embankment and strike the crane prior to their descent into the shaft on the morning of the walkout does not elevate to a degree of abnormality the potential danger of loose

rocks from the attendant sluicing operations falling upon the miners in the shaft.

The point of impact upon the crane by the falling rock is unascertainable from the witness' testimony. However, it would have been a physical impossibility for the rock to have struck that portion of the crane's boom elevated skyward over the shaft's mouth. And a rock striking the crane's cab or tracks which were positioned at all times behind the five foot, chain-link fence, reinforced with boards at its base and surrounding the mouth of the shaft, signaled no new threat to the safety of the men below because of the constant protection provided the miners by this intermediate barrier which remained intact throughout the *mining* phase of the work on the shaft's floor.

The Examiner credited only the testimony of the four discriminatees and their co-worker, Williams, an ordained minister, who failing to join in the walkout, was also characterized as a disinterested witness. According to Williams' description of working conditions in the shaft on the morning of the walkout, (1) there was only more water than usual flowing and standing on the shaft's slanted, rough floor, (2) the spray from the updraft of the pilot hole affected the miners' visibility only if they worked close to and looked directly down the pilot hole, practically covered by the cage, and (3) the gunite on the floor was no harder to walk on than the accustomed loose rock, hindering only the drilling of the floor.

The Examiner erroneously bolstered his conclusion that a combination of the slope of the floor, gunite, water and loose rock, made footing dangerously slippery on the morning in question by quoting out of context Williams' statement, "it was extremely hard to stand up and * * * start your holes to drill". Williams' remark was made in the course of an explanation as to the reason for respondent's mining the shaft's floor at an angle. The quoted portion simply described the drilling handicap always encountered with a slanted surface and was unintended as an expression of abnormal working conditions on the day in question:

"Of course, they (respondent) had an idea there to slant the floor so that the, I guess the rock would help to fall off in the hole and then you wouldn't have to blow so much off, *but because of that it was extremely hard to stand up and to get, start your holes to drill.*" (Emphasis supplied)

Williams appraised his co-workers' complaints as a "normal gripe" over conditions in the shaft, but personally did not regard the situation as intolerable as evidenced by his remaining on the job and resuming work in the shaft following the walkout, along with the other shifts.

Admittedly, the work was hazardous even under optimum conditions. However, to alleviate the anticipated aggravation from the presence of water, first detected in the previously constructed pilot hole, respondent furnished the miners with rain suits. As precautions against falling rock, respondent encircled the mouth of the shaft with a barrier, encased its walls with gunite-covered fencing, and equipped the miners working below with metal helmets. To protect the miners from falling into the pilot hole, they safeguarded their working positions on the ledge by fastening their individual safety harnesses to the cage which was itself utilized to prevent such an accident by covering over ninety per cent of the hole below. Recognizing the inherent, uncontrollable perils of the work which was dangerous per se, respondent awarded the miners added compensation and periodic bonuses for safety achievement.

In short, the uncontradicted documentary, photographic and other valid evidence of the physical facts, complementing the reasonable inference of normalcy of the protested working conditions drawn from the credited, disinterested testimony of Williams (not to mention the considerable, supportive testimony of respondent's witnesses which the Examiner discredited in toto) compels our conclusion that the Board's

determination abnormally dangerous circumstances justified the walkout is based upon isolated testimony of the alleged discriminatees and unreasonable inferences which are unsubstantial considering the record as a whole.[9]  See N. L. R. B. v. United Brass Works, Inc., 287 F.2d 689 (4th Cir. 1961); N. L. R. B. v. The Englander Co., 260 F.2d 67 (9th Cir. 1958); N. L. R. B. v. Sunset Minerals, Inc., 211 F.2d 224 (9th Cir. 1954); N. L. R. B. v. Stafford, 206 F.2d 19 (8th Cir. 1953).  Furthermore, credibility findings of the Board contradictory of substantial evidence of the laws of nature and undisputed documentary testimony need not rigidly control appellate review of all the evidence.  Cf. N. L. R. B. v. Dinion Coil Co., 201 F.2d 484 (2nd Cir. 1952).

Our decision is reached not unmindful of the Sixth Circuit's pronouncement in N. L. R. B. v. Knight Morley Corp., 251 F.2d 753 (6th Cir. 1957), cert. denied 357 U.S. 927, 78 S.Ct. 1372, 2 L.Ed.2d 1370 (1958), reh. denied 358 U.S. 858, 79 S.Ct. 15, 3 L.Ed.2d 93 (1958), which we deem both factually distinguishable and implying a construction of § 502 to which we do not subscribe.  In that case, the admittedly improper repair of an exhaust fan in a buffing department of an automobile parts manufacturing company created such an increased accumulation of dust, rise in temperature and change of humidity, that a highly qualified industrial health expert classified the working conditions as abnormally dangerous to the employees' health.  Reversal of the Board's order holding the company unlawfully discharged employees who had walked out in protest over working conditions was denied.  The court there refuted the company's argument that the employees, as laymen, were incompetent to testify to the physical conditions in the buffing room.  Distinguishably, the competency and admissibility of such testimony is uncontested in the instant case.  An even more significant distinction is the evaluation of those physical conditions as abnormally dangerous by an expert witness, a decisive factor in Knight Morley, and conspicuously absent in the case at bar.

■ Stronger reason for our reluctance to follow Knight Morley is the Sixth Circuit's unqualified construction that § 502 "expressly limits the right of management to require continuance of work under what the employees in good faith believe to be 'abnormally dangerous' conditions."  N. L. R. B. v. Knight Morley, supra, 251 F.2d at 759.  We do not believe that statement by the court was intended to convey the impression that only the good faith belief of the employees is necessary to sanction as a protected concerted activity their work stoppage in protest over avowed dangerous working conditions in view of the court's emphasizing the expert witness' opinion confirming their belief.  However, we clearly find that the effect of Section 502 in its application to the case at hand is that if employees acting concertedly leave their jobs believing in good faith abnormally dangerous working conditions prevail, they run the risk of discharge for engaging in a "strike" in contravention of a "no-strike" clause in their collective bargaining agreement or for participating in the unprotected activity of dictating to management their own terms and conditions of employment, should proof later of the physical facts fail to support their prior belief.

Our holding the Board's order unenforceable for reason the complainants are without right to reinstatement having engaged in unprotected concerted activity as defined under Section 502 of the Act renders passage on other issues raised in the petition for enforcement unnecessary.

Enforcement denied.

9. In view of our holding that the above categories of accepted evidence negate the existence of the three new elements the Board found produced abnormally dangerous working conditions, we shall not unduly lengthen our opinion by outlining respondent's discredited, countervailing evidence, worthy of our consideration under Universal Camera, supra.