The **HANNA MINING COMPANY,**
Appellant,

v.

**UNITED STEELWORKERS OF AMER-
ICA et al., Appellees.**

No. 72-1428.

United States Court of Appeals,
Eighth Circuit.

Submitted July 20, 1972.

Decided July 21, 1972.

Frank C. Heath, Jones, Day, Cockley & Reavis, Cleveland, Ohio, and Harry C. Applequist, Applequist, Nolan, Donovan, Larson, Barnes & Mathias, Duluth, Minn., for appellant.

John A. Spellacy, Grand Rapids, Minn., and Francis X. Helgesen, Minneapolis, Minn., for appellees.

Before HEANEY, BRIGHT and ROSS, Circuit Judges.

PER CURIAM.

This appeal is from a decision of the United States District Court for the District of Minnesota, denying the Hanna Mining Company's request for a temporary injunction. Hanna had requested the trial court to enjoin a walkout of its employees which resulted from a dispute over safety conditions at Hanna's taconite facilities in Northeastern Minnesota.

The United Steelworkers of America and Hanna are parties to a collective bargaining agreement covering wages,

hours and working conditions. The agreement specifically provides:

"* * * The Company shall continue to make reasonable provisions for the safety and health of its employees at the mine. The Company and the employees recognize their obligations under existing federal and state laws with respect to safety and health matters. * * *"

ART. XIII, Sec. 13.1.

Article III, Sec. 3.2, further provides:

"The Union reemphasizes its agreement with the objective of achieving the highest level of employee performance and efficiency consistent with safety, good health, and sustained effort, and agrees that the Union, its agents and members will not take, authorize, or condone any action which interfere with the attainment of such objective."

The agreement contains a broad "no strike" clause:

"* * * Should differences arise between the Company and the Union as to the meaning and application of the provisions of this contract, or as to any question relating to the wages, hours of work or other conditions of employment of any employee, there shall be no suspension of work on account of such differences, but an earnest effort shall be made to settle them promptly under the provisions of this Article. * * *"

ART. X, Sec. 10.1.

The agreement also provides an accelerated procedure for the settlement of disputes involving safety and health:

"* * * If an employee shall believe that there exists an unsafe condition, changed from the normal hazards inherent in the operation, so that the employee is in danger of injury, he shall notify his foreman of such danger and of the facts relating thereto. Thereafter, unless there shall be a dispute as to the existence of such unsafe condition, he shall have the right, subject to reasonable steps for protecting other employees and the equipment from injury, to be relieved from duty on the job in respect of which he has complained and to return to such job when such unsafe condition shall be remedied. The Management may in its discretion assign such employee to other available work at the mine. If the existence of such alleged unsafe condition shall be disputed, the chairman of the Grievance Committee of the Union at the mine or his designee and the Management's representative or his designee shall immediately investigate such alleged unsafe condition and determine whether it exists. If they shall not agree and if the chairman of the Grievance Committee or his designee is of the opinion that such alleged unsafe condition exists, the employee shall have the right to present a grievance in writing to the Management's representative or his designee and thereafter to be relieved from duty on the job as stated above. Such grievance shall be presented without delay directly to an impartial umpire under the provisions of Article X of this contract, who shall determine whether such employee was justified in leaving the job because of the existence of such an unsafe condition."

ART. XIII, Sec. 13.3.

A walkout of all Union employees occurred on June 9, 10 and 11, 1972. The trial court made the following findings of fact with respect to the walkout and the reasons for it:

(1) During the months preceding the walkout, the employees made numerous justifiable complaints with respect to safety conditions at the three Hanna properties. The complaints centered on dust, noise, falling rocks, fumes, and a reduction of personnel assigned to safety maintenance.

(2) Beginning in April of 1972, in both of its taconite plants, in order to increase production, the company added feeder rollers. This increased the speed of the belt, which had been originally de-

signed to travel at 156 inches per minute, so as to escalate to more than 200 inches per minute, and at times up to 225 inches per minute. This increased the safety hazards in connection with this operation at both the National Steel Taconite plant and the Butler Taconite plant.

(3) Frequent meetings were held between the Union and Hanna with respect to the complaints set forth above. Some of them were resolved, but many were left in an unresolved state.

(4) Matters came to a head at the National Taconite plant of Hanna on May 31, when four employees—who were assigned the responsibility of changing grates—refused to change them "on the fly" contending that it was dangerous to do so.

(5) Pursuant to Article XIII, Sec. 13.-3, of the agreement, other employees were assigned to the job, and work in the plant continued. Between May 31, and June 9, a number of meetings were held between Hanna and the Union, primarily with respect to the grate problem. The Union's initial demand was that the conveyor belt be stopped to permit changing the grates. The Union subsequently offered to accept, as a temporary solution, the assignment of a person to the operation who could determine, in each case, whether the conveyor should be stopped or slowed to permit the safe change of grates under the then existing circumstances. No grievance was filed by the affected employees with respect to the matter.

(6) On June 9, four employees again refused to make the change "on the fly."

Two were immediately suspended from work for this refusal for a period of three days, and the other two were warned. Word of the suspension traveled through the National plant and the other two facilities of Hanna, and all employees of Hanna walked off their jobs on June 9, 10, and 11, and have remained off their jobs since that time.

(7) Neither the International Union nor the Local Union ordered the employees off the job. The President of United Steelworkers of America, I. W. Abel, requested the employees to return to work,[1] but his request was not transmitted to the employees. The Local Union has not ordered the men back to work.

(8) Subsequent to the shutdown, Hanna refused to negotiate with respect to safety matters until such time as the men returned to work, and specifically declined to appear at a meeting called by the United States Mediation and Conciliation Service. It also refused permission to two Union officials to jointly inspect Hanna's premises with management representatives.

On the basis of these facts, the trial court refused to grant any relief to Hanna holding, in substance, that the Local Union was not required to arbitrate grievances concerning safety, and that Hanna had failed to show its entitlement to equitable relief.

■ Disputes over safety are required to be resolved through the specific grievance and arbitration procedures established in Article XIII, Sec. 13.3, of the agreement.[2] To protect employees

---

1. Mr. I. W. Abel, President of United Steelworkers of America, sent a telegram to the Union's District Director on June 12, 1972, which read as follows:

   "I have been informed that the members of Local Union 1438 and 2660 are engaged in an unauthorized work stoppage in violation of the International Constitution and our working agreement with Hanna Mining Company. If such a work stoppage is in progress, then the members of Local Union 1438 and 2660 should return to work at once and process their grievances through the regular grievance machinery of our working agreement with the company."

2. On July 18, 1972, the United States Court of Appeals for the Third Circuit reversed a decision of the United States District Court for the Western District of Pennsylvania, Gateway Coal Co. v. United Mine Workers of America, No. CA 71–567 (W.D.Pa., filed June 28, 1971), which required the United Mine Workers to order employees, who had walked off the job in protest over safety conditions in a mine, to return to work.

against injury while a safety grievance is being processed, the grieving employee may refuse to perform the allegedly unsafe work until the grievance is finally resolved. But an employee must file a written grievance within a reasonable time after his refusal to perform the work if he desires to protect his job and avoid disciplinary action. If the position advocated by the employee is ultimately held to be correct, the employee is entitled to be paid for all time lost. If not, the employee is entitled to be reinstated to his job without penalty.

The agreement recognizes the necessity for prompt resolution of safety grievances and eliminates the intermediate steps provided for the resolution of other grievances. It specifically requires that safety grievances be presented without delay directly to an impartial umpire. In the arbitration proceeding, the federal and state safety standards are to be considered by the umpire as well as other evidence presented by the parties.

The fact that the agreement provides a method of resolving disputes over safety and health does not, of course, relieve the federal or state authorities from their responsibilities in providing a safe place to work. This dual authority may lead to conflict, but the parties have agreed that safety disputes are to be resolved by arbitration; and it is not for us to rewrite their agreement.

There remains the question as to whether Hanna is entitled to injunctive relief because the employees failed to use the grievance procedure specifically provided. This is an equitable matter, and the equities are not all on the side of Hanna.[3]

Hanna violated the agreement by immediately suspending two of the men who refused to change the grates. It was obligated to give them a reasonable opportunity to file a grievance and pro-

Gateway Coal Co. v. United Mine Workers of America, 466 F.2d 1157 (3rd Cir., filed July 18, 1972). The Court of Appeals held that employees could strike to protest conditions in the mines that affected their life and health despite the presence of a broad arbitration and "no strike" clauses in the working agreement. The instant case is clearly distinguishable. Here, the agreement specifically requires that safety disputes be submitted to arbitration and, more importantly, gives employees a right to refuse to perform work which they feel affects their safety.

The Union contends on appeal that the walkout is protected by 29 U.S.C. § 143. That section provides:

"Nothing in this chapter shall be construed to require an individual employee to render labor or service without his consent, nor shall anything in this chapter be construed to make the quitting of his labor by an individual employee an illegal act; nor shall any court issue any process to compel the performance by an individual employee of such labor or service, without his consent; *nor shall the quitting of labor by an employee or employees in good faith because of abnormally dangerous conditions for work at the place of employment of such employee or employees be deemed a strike under this chapter.* * * *"
(Emphasis added.)

The trial court did not make a finding that the employees walked off the job in the good faith belief that the conditions for work were abnormally dangerous, and such a finding is necessary to bring that section into play. Furthermore, the trial could did not base its decision on this statute. See, U. S. Steel Corp. v. United Mine Workers, Nos. 19038, 19039, 19040, 19041 (3rd Cir., filed June 30, 1970) reported at 74 L.R.R.M. 2611; N.L.R.B. v. Fruin-Colnon Construction Co., 330 F.2d 885 (8th Cir. 1964); National Labor Relations Bd. v. Knight Morley Corp., 251 F.2d 753 (6th Cir. 1957), cert. denied, 357 U.S. 927, 78 S.Ct. 1372, 2 L.Ed.2d 1370, rehearing denied, 358 U.S. 858, 79 S.Ct. 15, 3 L.Ed.2d 93 (1958).

3. In Hecht Co. v. Bowles, 321 U.S. 321, 329–330, 64 S.Ct. 587, 592, 88 L.Ed. 754 (1944), the Supreme Court stated:
"* * * The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it. The qualities of mercy and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims. * * *"

tect their right to refuse to do the work without penalty. This is not to say that employees can thwart the arbitration procedure by consistently and successively refusing to file grievances but in the instant case, the matter was under discussion between Hanna and the Union when the two employees were summarily suspended.

Hanna's refusal to permit Union representatives to inspect the plant and its refusal to attend conciliation sessions called by the United States Mediation and Conciliation Service also bears on its right to injunctive relief.[4]

Finally, there is evidence in the record that Hanna, in an effort to increase efficiency and speed production, made changes in established safety procedures and practices, some of which the trial court found to be without justification. Moreover, Hanna did not always act promptly on safety grievances. This practice led to a loss of confidence among employees with respect to the settlement of safety matters through the contractual processes.

■ We, thus, have a situation in which the Local Union, its officers and its agents, and the employees themselves have violated provisions of the collective bargaining agreement requiring that safety disputes be submitted to arbitration. But, it is also a situation in which their actions were provoked by changes in safety practices and procedures and probably exacerbated by the failure of management to meet with representatives of the International Union, either directly or under the auspices of the

United States Mediation and Conciliation Service after the walkout occurred.

Under these circumstances, we feel that we are required to take steps which will protect the rights of all parties and will—consistent with the twin-national goals of safety and labor peace—resolve this dispute. We, therefore:

(1) order the Hanna Mining Company to immediately reinstate those employees that it has suspended or otherwise penalized for failing to change the grates "on the fly" to the positions previously held by them, and to permit all employees to return to work without penalty;

(2) require the Local Union, its officers and its agents, to immediately order the employees of Hanna to return to work, and to inform such employees that they will not be penalized by the Union for doing so;

(3) require Hanna Mining Company, on resumption of operations, to shutdown and lock the conveyor belt while the grates are being changed or, alternatively, to arrange for supervisory employees to change the grates, or to arrange for a method of change satisfactory to the Union—this policy to continue pending arbitration in accordance with the time schedule outlined below;

(4) require the affected employees to submit a grievance on the matter of changing the grates "on the fly" no later than 4:00 P.M., Monday, July 24, 1972—this requirement is imposed notwithstanding the time requirement of Article X, Sec. 10.1, of the agreement; and

---

4. The trial court found that the walkout was not influenced by Local Union officials or by any International Union representative. In the light of this finding, the failure of Hanna to permit the on-site inspection by representatives of the International Union and to respond to a call of the Federal Mediation and Conciliation Service (FMCS) for a meeting was at least arguably a refusal to bargain. See, Rutland Railway Corp. v. Brotherhood of Locomotive Engineers, 307 F.2d 21, 40 (2nd Cir. 1962), cert. denied, 372 U.S. 954, 83 S.Ct. 949, 9 L.Ed.2d 978 (1963).

But see, United Electrical Radio and Machine Workers of America v. N.L.R.B., 96 U.S.App.D.C. 46, 223 F.2d 338, 344 (1955), cert. denied, 350 U.S. 981, 76 S.Ct. 466, 100 L.Ed. 850 (1956).

In the light of our decision requiring the Local Union to order the men back to work, we need not specifically decide this question. We hold only that, under the circumstances of this case, Hanna's refusals will be considered by this Court in determining the equitable relief that it will grant.

(5) require the parties to submit the question of employee obligation to change the grates "on the fly" to arbitration without delay. Specifically, we require:[5]

(a) That representatives of the Union and Hanna meet no later than 48 hours after the receipt of the written grievance for the purpose of selecting a neutral arbiter. The neutral arbiter shall be one who can and will hear the dispute without delay. Failing agreement on a neutral arbiter, the parties shall immediately request the United States Mediation and Conciliation Service to appoint an arbiter. That agency shall be made aware of the terms of this opinion so that it will understand the need to make its appointment without delay.

(b) That the parties submit the matter to arbitration within 15 calendar days after the selection or appointment of an arbiter.

(c) That the arbiter's decision be handed down within 10 calendar days of the date of submission to him.

(d) That a copy of the arbiter's decision be filed with this Court and the trial court.

For the purposes of this order, we do not disturb the finding of the trial court that a sufficient showing has been made by the Union that the conditions are unsafe for the affected employees being required to change the grates "on the fly," but we make it clear that we express no final opinion on the matter and the arbiter remains free to make such findings and orders with respect to the matter as he feels justified.

Many other complaints with respect to health and safety have been made by the employees in recent months. The Court makes no specific order with respect to such complaints, but contemplates that they will be handled in accordance with the collective bargaining agreement as construed by this Court. We only add

that everyone's interest will be served by fairly and promptly disposing of these matters. If arbitration is necessary, it should not be delayed and common grievances should be grouped to save time and expense.

Nothing in this opinion shall be construed as relieving federal and state agencies from their duty to enforce appropriate federal and state laws and regulations.

We reverse the trial court and remand this matter to it for such further action as may be required.

Let the mandate of this Court be issued forthwith.

---

5. Northwest Airlines, Inc. v. Air Line Pilots Ass'n, Inter., 442 F.2d 246, 249 (8th Cir. 1970).