**PEABODY COAL MINE, Plaintiff,**

v.

**LOCAL UNION NO. 7869, UNITED MINE WORKERS OF AMERICA, Defendant.**

**No. FS-73-C-67.**

United States District Court,
W. D. Arkansas,
Fort Smith Division.

July 5, 1973.

Gerald L. DeLung of Warner, Warner, Ragon & Smith, Fort Smith, Ark., Harold I. Elbert of Kohn, Shands, Elbert, Gianoulakis & Giljum, St. Louis, Mo., for plaintiff.

Sam Sexton, Jr., Fort Smith, Ark., for defendant.

## OPINION

JOHN E. MILLER, Senior District Judge (sitting by designation).

### Pleadings

The plaintiff is a corporation duly organized and existing under the laws of the State of Delaware, is duly licensed to do business in Arkansas, and is an employer engaged in commerce within the meaning of 29 U.S.C.A. § 152(2) and (7).

The defendant is an unincorporated labor organization duly chartered by International Union, United Mine Workers of America, and represents employees in industries affecting commerce within

the meaning of 29 U.S.C.A. § 152(5) and (7).

On or about November 12, 1971, plaintiff entered into a collective bargaining agreement entitled "National Bituminous ·Coal Wage Agreement of 1971," with the International Union, United Mine Workers of America, on behalf of each member thereof and Local 7869.

On June 26, 1973, plaintiff filed its verified complaint against Local Union 7869 of United Mine Workers of America, seeking a temporary restraining order restraining the defendant, its members, officers, agents, servants and employees from engaging in any strike, partial strike, slowdown, work stoppage or refusal to work at plaintiff's Ozark Strip Mine because of the disputes between plaintiff and the defendant as specifically alleged in paragraphs 9, 10, 11, 12, 13 and 14 of the complaint. The plaintiff further prayed that the defendant be required to submit the grievances to arbitration pursuant to the Grievance Procedure or the Settlement of Health and Safety Disputes Procedure, and that preliminary injunction should be granted enjoining defendant from committing any of the acts set forth in said complaint.

Jurisdiction is granted by 29 U.S.C.A. § 185.

Notice of the filing of the complaint was served in the afternoon of June 28, 1973, demanding the attendance of the defendant in court at 10:00 a. m. on June 29, 1973. Counsel for defendant was not contacted nor employed until about 9:00 a. m. on the morning of June 29, 1973, the date set for the hearing.

At that time the defendant filed an answer, in which it alleged:

"(1) The Petition, on its face, discloses that the Petitioner seeks an injunction to compel the members of the Defendant Union, to work in Petitioner's mining operation in violation of conditions which are proscribed and prohibited by the Federal Coal Mine Health & Safety Act of 1969 (Public Law 91–173, 83 Stat. 742, 30 U.S.C.A. § 801 et seq.).

"(2) The Defendant states that its members have always been ready, willing and able to perform work and labor for the Petitioner, but that the Congress of the United States in the Federal Coal Mine Health & Safety Act of 1969 provided that no man should be compelled to work in unsafe conditions. The Petition on its face discloses the existence of conditions which are violative of the Federal Coal Mine Health & Safety Act of 1969 and this Court should not undertake to substitute its judgment as to the health and safety of the affected workers for that of Congress."

Upon the convening of the court at 10:00 a. m. on the date fixed, the parties agreed that the court should hear the testimony and determine whether a preliminary injunction should be granted in lieu of a temporary restraining order.

The parties proceeded with the introduction of their evidence.[1]

In the amended and substituted answer, the defendant denied that this action arises under Section 301 of the Labor Management Relations Act, as amended, 29 U.S.C.A. § 185 and under

---

1. At the conclusion of the evidence the court called the attention of counsel to Boys Markets, Inc., v. Retail Clerks Union, Local 770, (1970) 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199; Hanna Mining Co. v. United Steelworkers of America, (8 Cir. 1972) 464 F.2d 565; and Detroit Newspaper Publishers Asso. v. Detroit Typo. Union No. 18, etc., (6 Cir. 1972) 471 F.2d 872, and stated that the court would consider those decisions along with any others which the parties might desire to call to the attention of

the court. Whereupon counsel for defendant stated that he desired to have an opportunity to submit a memorandum in support of defendant's contentions. In view of the fact that defendant had had very brief notice, the court advised counsel to proceed to submit the memorandum at the earliest possible time. On Monday, June 2, 1973, counsel submitted memorandum brief together with amended and substituted answer. Likewise, the plaintiff submitted on the same day a memorandum in support of its conclusions.

28 U.S.C.A. § 1331, and alleged that the instant action is a good-faith dispute concerning abnormally dangerous working conditions, and that such actions are specifically excluded from the operation of Section 301 of the Labor Management Relations Act. Defendant denied that its members have been disgruntled because of the scheduling of week-end overtime. Paragraph 13 of the complaint is denied, and the defendant stated:

> "While each of the 51 separate items deemed unsafe may be subject to arbitration, the defendant states that the cumulative effect of the 51 conditions is such in the good-faith judgment of the Union, as to render the mine too dangerous in which to do further work until the danger is eliminated. The Union states that by virtue of contract Article III, Section (g)(1), the Union Mine Safety Committee has required the removal of workers from the area until the danger has abated. The contract vests this right exclusively in the Union and the Union relies upon the contract in this regard."

It is further alleged that the miners are refusing to work until the "unsafe conditions" are corrected, although the miners have separately offered to return to work for the purpose of correcting the "unsafe conditions" and then to resume full and normal production. That the contract does not contain a no-strike clause, and there is no language in the contract which requires the members of the Union to work in conditions considered dangerous or unsafe, and the Union believes that the conditions presently existing at the mine to be unsafe and dangerous to the health and safety of the workmen, and therefore specifically pleads 29 U.S.C.A. § 143.

### Evidence

The plaintiff introduced Exhibits 1, 2, 3, 4 and 5. Exhibit 1 is the National Bituminous Coal Wage Agreement of 1971 between the Bituminous Coal Oper-

ators' Association, Inc., and the United Mine Workers of America.

Section (a) of Article XVII of the Wage Agreement provides that a committee of three employees shall be elected at each mine by the other employees. "The duties of the mine committee shall be confined to the adjustment of disputes arising out of this agreement that the mine management and the employee or employees have failed to adjust. The mine committee shall have no other authority or exercise any other control, nor in any way interfere with the operation of the mine; * * *."

Section (b) of said article provides that should differences arise between the Mine Workers and Employer "as to the meaning and application of the provisions of this agreement, or should differences arise about matters not specifically mentioned in this agreement, or should any local trouble of any kind arise at the mine, an earnest effort shall be made to settle such differences at the earliest practicable time."

Step 1, page 50, Exhibit 1, Contract, provides:

> "By the aggrieved party and his foreman who shall have authority to settle the complaint. Any grievance which is not filed by the aggrieved party within fifteen calendar days after he reasonably should have known of such grievance shall be considered invalid and not subject to further prosecution under the grievance machinery."

Step 2 provides:

> "If no agreement is reached, the grievance shall be taken up by the mine committee and the mine management within five calendar days of the conclusion of step 1."

Step 3 provides:

> "If no agreement is reached, the grievance shall be taken up by the UMW district representative and a designated representative of the Employer within ten calendar days of the conclusion of step 2."

After steps 1, 2 and 3 have been exhausted, then subsections (4) and (5) of section (b) apply, and provide:

"(4) If no agreement is reached, the grievance shall be taken up by the Board within ten calendar days of the conclusion of step 3 or in discharge cases within five calendar days of notice of appeal. The Board shall consist of four members, two of whom shall be designated by the Union and two by the Employer. Neither the Union's representatives on the Board nor the Employer's representatives on the Board shall be the same persons who participated in steps 1, 2 or 3 of this procedure.

"(5) Should the Board fail to agree the matter shall, within ten calendar days after decision by the Board, be referred to an umpire who shall expeditiously and without delay decide said case. The decision of the umpire shall be final. Expenses and fees incident to the services of an umpire shall be paid equally by the Employer or Employers affected and by the Union.

"The grievant shall have the right to be present at each step, if he so desires, of the foregoing procedures until such time as all evidence is taken. A decision reached at any stage prior to step 5 of the proceedings above outlined shall be reduced to writing and signed by both parties. The decision shall be binding on both parties and shall not be subject to reopening except by mutual agreement."

Article III of the contract deals with "Health and Safety" under the provisions of the Federal Coal Mine Health and Safety Act of 1969, and appears at pages 5, 6, 7, 8 and 9 of the contract.

Section (b) of Article III provides that the Federal Mine Safety Code for Bituminous Coal and Lignite Mines, underground mines and strip mines, promulgated and approved October 8, 1953, by the Secretary of the Interior, is adopted and incorporated by reference in the contract.

Section (c) provides that whenever inspectors of the United States Bureau of Mines, in making their inspections in accordance with the authority as provided under the Act, "find there are violations of the Federal Mine Safety Code and make recommendations for the elimination of such noncompliance, the operators shall promptly comply with such recommendations," but whenever either party to the contract feels that compliance with the recommendations would cause irreparable damage or great injustice, they may appeal such recommendation to the Joint Industry Health and Safety Committee as provided in section (e).

Section (g), page 8 of the contract, provides:

"(1) The mine health and safety committee may inspect any portion of a mine and surface installations in connection therewith. If the committee believes conditions found endanger the lives and bodies of the employees, it shall report its findings and recommendation to the Employer. In those special instances where the committee believes an imminent danger exists and the committee recommends that the Employer remove all employees from the involved area, the Employer is required to follow the recommendations of the committee.

"(2) While making inspections, the mine health and safety committee shall be accompanied by a representative of the Employer."

On May 30 and 31, 1973, inspections of the mine were made by a federal mine inspector who found no violations and issued an order abating one prior violation. Sometime prior to June 14, 1973, the Safety Committee of the miners compiled a list of 51 alleged "Unsafe Conditions." The list was apparently approved at a meeting of the employees on June 14 but it was not given to the mine superintendent until June 21, 1973.

The list of "Unsafe Conditions" was compiled without making any positive check or examination of danger, and

said list was compiled in answer to a notice, Exhibit 5, that had been posted on the bulletin board on the morning of June 14, 1973, directed to all Ozark Mine employees. In that notice, the Superintendent and Health and Safety Supervisor of the mine called attention to the regulations of the mine which required that all high-voltage trailing cables "shall be handled only by persons wearing protective rubber gloves and with such other protective devices as may be necessary and appropriate under the circumstances." On the subject of booms and masts, the notice provided:

"The booms and masts of equipment operated on the surface of any coal mine shall not be operated within 10 feet of an energized overhead power-line. Where the voltage of overhead powerlines is 69,000 volts, or more, the minimum distance shall be as follows: 69,000 to 114,000 volts—12 feet, 115,000 to 229,000 volts—15 feet, 230,000 to 344,000 volts—20 feet, 345,000 to 499,000 volts—25 feet, and 500,000 or more volts—35 feet."

Two of the defendant's witnesses testified that some of the unsafe conditions had existed for a considerable period of time, but the federal inspector did not find any unsafe conditions on May 30 and 31, 1973.

The great majority of the employees of defendant, 22 in number, are members of the defendant union. Joe Lake, the Director of Service of the Service Division of plaintiff, was at the mine on June 21. On June 22 the Union members struck without notice, and the mine was forced to close and has remained closed.

The Mine Safety Committee did not comply in any respect with the requirements of the Collective Bargaining Agreement and failed to submit any of the so-called "unsafe conditions" to the grievance procedure or to the settlement of health and safety disputes procedure provided for in the Bargaining Agreement. In the bulletin that was posted by the plaintiff on June 14, above referred to, the following statement appears:

"In view of Ozark mine's fine record of accidents so far this year, these above listed sections of the Federal Register should be reviewed by everyone so that we might maintain our good record. This in turn assures us that everyone will remain healthy and alive."

Exhibit 2 is an injury report of plaintiff of all its active strip mines from January to November 1972, and discloses that during that time five injuries were reported in the Ozark Mine but no days lost, and no mention is made of the severity of the injury. Exhibit 3 is a report covering January to May 1973, and discloses that one injury was reported in the mine, but no mention is made of the severity and no time was lost.

Notwithstanding the defendant's safety committee did not claim that any of the conditions listed were imminently dangerous to the lives and bodies of the employees, the local safety man of the plaintiff, after checking the list on June 22, examined the same and corrected some of the conditions.

*Applicable Law*

In speaking of the action of the court on cases involving similar questions, the Supreme Court in Boys Markets v. Retail Clerks Union (1970), 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199, said at page 242 of 398 U.S., at page 1588 of 90 S.Ct.:

" * * * the Act itself manifests a policy determination that arbitration should be encouraged. See 29 U.S.C. § 108. Subsequently in the Steelworkers Trilogy we emphasized the importance of arbitration as an instrument of federal policy for resolving disputes between labor and management and cautioned the lower courts against usurping the functions of the arbitrator."

■■ Provisions in a collective bargaining agreement which require final and binding arbitration have been con-

strued to imply a "no strike" clause. A strike over a matter which is subject to the "Settlement of Disputes" clause (general grievance procedure), or the procedure for the "Settlement of Health or Safety Disputes," must be enjoined where the collective bargaining agreement provides for final and binding arbitration. Boys Markets v. Retail Clerks Union, supra; Old Ben Coal Corp. v. Local Union No. 1487, United Mine Workers of America, (7 Cir. 1972) 457 F.2d 162. In Blue Diamond Coal Co. v. United Mine Workers of America (6 Cir. 1970), 436 F.2d 551, the Court of Appeals for the Sixth Circuit had before it an action for damages growing out of illegal work stoppage. The court held that the provisions of the National Bituminous Coal Wage Agreement implied a "no strike" clause and that the union was liable for damages growing out of a strike which violated said implied clause.

The case of Hanna Mining Co. v. United Steel Workers of America (8 Cir. 1972), 464 F.2d 565, involved a complete work stoppage growing out of a safety dispute. The collective bargaining agreement involved in that case required binding arbitration of safety disputes, and the court ordered the employees to return to work and proceed with settlement of such disputes pursuant to the grievance procedure provided in the collective bargaining agreement, and that where the collective bargaining agreement contained a grievance procedure requiring binding arbitration in safety disputes, injunctive relief is proper.

The defendant cites and relies on the case of Gateway Coal Co. v. United Mine Workers of America (3 Cir. 1972), 466 F.2d 1157, as authority for its position in the instant case. The Gateway case is clearly distinguishable on its facts since it involved an underground coal mine as distinguished from a surface mine.

In National Labor Relations Board v. Fruin-Colnon Const. Co., (8 Cir. 1964) 330 F.2d 885, the court rejected the contention that an employee's belief that a dangerous working condition exists would relieve him of the obligation to work. Instead, the court held that the employee assumed the risk of discharge if it should be subsequently determined that the condition which caused him to strike was not an "abnormally dangerous" condition.

The provision in the contract for settlement of health and safety disputes imposes limitations on the Safety Committee and obligates it to follow the settlement of health and safety disputes provision in the collective bargaining agreement rather than to arbitrarily shut down the mine.

### Conclusion

Everyone knows that surface mining of coal involves heavy equipment and the movement of large quantities of dirt and coal. There is certainly danger involved in the work, but the degree of danger required to be proved before any work stoppage is authorized is prescribed by the various statutes and the contract heretofore referred to. The defendant has failed to comply with the law and its contract, and its action in striking is illegal and without justification, and the plaintiff is entitled to a preliminary injunction as prayed for in the complaint.