BOSTON AND MAINE
CORPORATION,
Petitioner,

v.

R.M. LENFEST, Jr., Individually and as
Chairman of The General Committee of
Adjustment, United Transportation Un-
ion (T), et al.

Civ. A. No. 85–4106–C.

United States District Court,
D. Massachusetts.

Nov. 27, 1985.

John E. O'Keefe, John J. Nee and Kinga LaChapelle, Billerica, Mass., for petitioner.

James Freeley, Jr., Feeney & Freeley, Boston, Mass., for respondents.

George J. Cahill, Jr., Cahill, Goetsch & DiPersia, John G. DiPersia, New Haven, Conn., for Rogert M. Lenfest, Jr.

---

## MEMORANDUM

CAFFREY, Chief Judge.

This is an action for a permanent or, alternatively, a preliminary injunction brought by the Boston and Maine Corporation (hereinafter the "B & M"), a common carrier by railroad engaged in interstate commerce transporting freight in New York, Massachusetts, Maine, New Hampshire, Vermont and Connecticut and transporting passengers in Massachusetts, New Hampshire and Vermont, against the General Committee of Adjustment, United Transportation Union (hereinafter the "Committee"), Roger M. Lenfest, Jr., Chairman of the Committee, and others. The Committee is a subordinate body of the United Transportation Union (hereinafter the "UTU"), an unincorporated association and a labor organization which represents persons employed as conductors and trainmen by the B & M for purposes of collective bargaining under the Railway Labor Act, 45 U.S.C. § 151 et seq. (hereinafter the "RLA"). The B & M claims, and respondents do not dispute, that this case arises under the RLA and involves an amount in controversy exceeding the sum of $10,000.00, exclusive of interest, costs and reasonable attorneys' fees. The Court's jurisdiction is grounded upon 28 U.S.C. §§ 1331 and 1337.

This action stems from a general work stoppage and picketing on November 4, 1985 by members of the UTU, ordered by respondent Roger M. Lenfest, Chairman of the General Committee of Adjustment of the UTU. After a hearing in the afternoon and early evening of November 4, District Judge Frank J. Murray granted the B & M's request for a temporary restraining order enjoining the respondents from engaging in any such refusal to work until November 13, 1985. On November 12, 1985 the respondents filed a motion to dismiss the B & M's complaint on the grounds of lack of subject matter jurisdiction and failure to state a claim. A hearing on the preliminary injunction was held on November 14, 1985. At the close of the hearing, this Court extended the temporary restraining order pending its decision on the preliminary injunction.

At approximately 4:00 a.m. on Monday, November 4, 1985, members of the UTU appeared at various locations throughout the B & M system carrying signs indicating that the UTU was on strike. The strike caused a cessation of both B & M's passenger and freight services during the entire day of November 4. As a result, approximately 25,000 regular commuters on the B & M were forced to either find alternative transportation to and from work, or to stay home. The B & M also received numerous complaints about delays in and the lack of

freight service. The strike was called by Lenfest on his own *ipse dixit* in his capacity as Chairman of the Committee. On Sunday, November 3, Lenfest decided to call the strike after informally discussing a strike with chairmen various locals sitting on the Committee. The B & M received no notice whatsoever prior to the strike that a work stoppage was to be called or why it was to be called. I find that Committee Chairman Lenfest made himself inaccessible to the B & M officials on the morning of the strike. The first thing the B & M was able to learn about the reason for the strike was from picketing conductors and trainmen. When questioned by B & M officials, they stated that it involved safety.

Respondents now assert that the reason Committee Chairman Lenfest called the strike was that the B & M repeatedly had failed to provide flagging at construction sites along the railroad to alert oncoming trains that there might be workers on or near the tracks. Lenfest testified at the hearing on November 4 that the B & M's failure to provide flagmen at various unidentified times and locations had created unsafe working conditions. Lenfest could not recall any such unsafe conditions existing during the week prior to November 4. On May 3, 1985, approximately six months earlier, the UTU filed a notice pursuant to Section 6 of the RLA, 45 U.S.C. § 156, with respect to the B & M's failure to provide flagging protection. A meeting between the B & M and the UTU over this notice took place on June 5, 1985. At the present time, the matter is pending before the National Mediation Board.

At the hearing on November 14, Lenfest testified that prior to calling the strike he had received reports of a failure to provide flagging protection at four or five specific locations. In light of Chairman Lenfest's inability to provide any information on November 4, the day of the strike, regarding specific instances of the B & M's failure to provide flagging protection on its tracks, the Court is skeptical of his claimed ability to do so on November 14. While it is doubtful from the record whether Lenfest knew on November 4 of any presently or recently existing unsafe conditions resulting from the B & M's failure to provide flagging protection along the B & M system, it is clear and I find that Lenfest never notified anyone at B & M of specific situations of non-flagging. I find that at certain times prior to November 4 Lenfest expressed his general concern to B & M Assistant Manager of Crew Dispatching, Roger Audette, that flagging be provided and that only UTU members do the flagging. However, I also find that Lenfest never reported any specific instances of B & M's failure to provide flagging. Audette testified that the last time he spoke with Lenfest was on October 25 and that Lenfest did not mention flagging or a possible work stoppage. Lenfest, by his own admission, never discussed the flagging problem with anyone at B & M other than Audette. John Rafferty, the Chief Inspector of the Construction Department at B & M, testified that it is solely his responsibility to decide whether to give flagging protection to a contractor and that no one has ever informed him that contractors were working without flagging protection. John J. Cronin, the Senior Director of Labor Relations at B & M, testified that he was never requested by anyone to confer over the B & M's failure to provide flagging. Cronin is the officer within B & M to whom such a request should be made.

At the November 14 hearing, William Kempton, a locomotive engineer for the B & M, testified that on October 2 his train nearly collided with a tractor trailer carrying railroad ties across the tracks. Kempton testified that he did not see a flagman anywhere near the tracks. Leo MacDonald, a yardman for the B & M working in Boston Yard 14, testified as to a near accident between a locomotive and a crane in the railroad yard on November 1. MacDonald testified that the lack of flagging in the yard created an unsafe condition which caused him to refuse to work on November 4. Although MacDonald met with Chairman Lenfest on November 3, he testified that he did not mention this near accident, nor did he inform the B & M that he would

cease working unless a flagman was placed in the yard.

The B & M contends that respondents' system-wide work stoppage on November 4 constituted an illegal strike because respondents failed to employ the dispute resolution procedure for "minor" disputes set forth in Section 3 of the RLA, 45 U.S.C. § 153. The B & M seeks an injunction to temporarily or permanently enjoin the respondents from striking and picketing. Respondents argue that their work stoppage was not a strike over either a "minor" or a "major" dispute and that they therefore had no legal obligation to proceed under the procedures set forth in Section 6 or Section 3 of the RLA; they claim that the work stoppage was a valid refusal to work under hazardous conditions pursuant to Section 10 of the Federal Railroad Safety Act, 45 U.S.C. § 441 (hereinafter the "FRSA"), as amended. The respondents vigorously contend that because they have invoked the protection of Section 10 of the FRSA, this Court does not have jurisdiction to issue an injunction against the work stoppage. For the reasons discussed below, the Court agrees with petitioner B & M and rules that it is entitled to a preliminary injunction enjoining respondents from a general work stoppage such as that which Committee Chairman Lenfest called on November 4.

Section 4 of the Norris-LaGuardia Act deprives federal courts of "jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute." 29 U.S.C. § 104. Therefore, absent an exception to the Norris-LaGuardia Act, this Court cannot exercise jurisdiction to enjoin the respondents in this action. The United States Supreme Court has held that the Act is not a bar to an injunction in a case for which the RLA provides the process for final decision. *Brotherhood of Railroad Trainmen v. Chicago R. & I.R. Co.*, 353 U.S. 30, 42, 77 S.Ct. 635, 641, 1 L.Ed.2d 622 (1957). A district court may enjoin either party from altering the status quo during the course of a Section 6 "major" dispute

resolution proceeding. *Carbone v. Meserve*, 645 F.2d 96, 98 (1st Cir.1981). Once the Section 6 procedures have been exhausted, however, the Norris-LaGuardia Act operates to deprive a district court of jurisdiction to grant injunctive relief. *Missouri-Kansas-Texas Railroad Company v. Brotherhood of Railroad Trainmen*, 342 F.2d 298, 299 (5th Cir.1965). Where either party to a dispute resorts to self-help in a "minor" dispute, a district court may enjoin that party as long as the non-striking party can make the traditional showing of irreparable harm. *Carbone*, 645 F.2d at 98. Therefore, it is necessary to determine whether this case involves a "major" or a "minor" dispute, or neither.

Congress distinguished between disputes which are required to be handled pursuant to Section 6 of the RLA, 45 U.S.C. § 156, and those which are to be handled pursuant to Section 3, 45 U.S.C. § 153. The United States Supreme Court explained the distinction between Section 6 and Section 3 disputes, saying that "major" disputes are to be resolved under the procedures of Section 6 and "minor" ones under Section 3:

> [A 'major' dispute] relates to disputes over the formation of collective agreements or efforts to secure them. They arise where there is no such agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy. They look to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past.

> The second class, [minor disputes], contemplates the existence of a collective agreement already concluded or ... a situation in which no effort is made to bring about a formal change in terms or to create a new one. The dispute relates either to the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case. In the latter event the claim is founded upon some incident of the employment relation, or asserted one ... In either case the claim is to rights accrued,

not merely to have new ones created for the future. *Elgin, Joliet & Eastern Railway Co. v. Burley,* 325 U.S. 711, 723, 65 S.Ct. 1282, 1289, 89 L.Ed. 1886 (1945).

The RLA creates a process of non-compulsory adjustment for "major" disputes. Section 6 of the RLA, 45 U.S.C. § 156, sets forth detailed procedures for negotiation, mediation before the National Mediation Board, and arbitration. If a "major" dispute is not resolved after the parties have exhausted these dispute resolution mechanisms, the parties may resort to self help. Where the dispute is only "minor" the parties are not free to resort to self-help after exhausting the settlement procedures prescribed by Section 3. Instead, the National Railroad Adjustment Board has the authority to impose a binding settlement on the parties. *Elgin, Joliet & Eastern Railway Co.,* 325 U.S. at 724–728, 65 S.Ct. at 1290–1292 (1945).

In this case petitioner B & M contends that the dispute with respect to flagging is a "minor" dispute to be resolved by Section 3 binding arbitration and that it has made a showing of irreparable harm. There is no question that respondents have not sought to invoke the dispute resolution machinery of Section 3. The B & M also asserts that it has made a showing of irreparable harm. Accordingly, the B & M argues that this Court has jurisdiction to issue an injunction against the November 4 general work stoppage by respondents. Notwithstanding the UTU's filing of a Section 6 notice with respect to the flagging issue on May 3, 1985, the respondents now argue that the flagging issue is neither a "major" nor a "minor" one under the RLA. Respondents argue instead that the November 4 work stoppage was a refusal to work under hazardous conditions, within the meaning of Section 10 of the FRSA, 45 U.S.C. § 441, as amended. Respondents further contend that the exclusive remedy under Section 10 of the FRSA is binding Section 3 (RLA) arbitration. I rule that the dispute over the B & M's alleged failure to provide flagging in this case is a "minor" dispute, that the petitioner B & M has made a showing of irreparable harm, and that Section 10 of the FRSA does not apply to this case. Accordingly, I rule that this Court has jurisdiction to enjoin the respondents' general strike.

In *Missouri-Kansas-Texas Railroad Co. v. Brotherhood of Railroad Trainmen,* 342 F.2d 298 (1965), the Court of Appeals for the Fifth Circuit was faced with the question whether the alleged failure of the railroad to provide union employees safe working conditions was a "minor" or a "major" dispute under the RLA. After reviewing the Supreme Court's differentiation of those terms in the *Elgin* case, the court held that such a dispute was, indeed, a "minor" dispute to be resolved pursuant to Section 3 of the RLA. The court explained:

It is true that there is no express written provision in the existing collective agreement between the parties with respect to the working conditions of which the defendant complains. But the common law duty of the plaintiff to use reasonable care in furnishing its employees with a safe place to work is clear, [citation omitted].

*Id.* at 300. A "minor" dispute, to be handled pursuant to the dispute resolution procedure of Section of the RLA, involves a claim which, in the words of the Supreme Court in *Elgin,* "is founded upon some incident of the employment relation ... to rights accrued, not merely to have new one created for the future." *Elgin, Joliet & Eastern Railway Co.,* 325 U.S. at 723, 65 S.Ct. at 1289 (1945). In summary, employees have a legal right to safe working conditions, whether or not the collective bargaining agreement contains a provision to that effect. That right is an incident of the employment relation and any dispute concerning that right is a "minor" dispute to be processed under Section 3 of the RLA.

This Court therefore has authority to enjoin a strike over this dispute if petitioner has made a showing of irreparable harm. The Court finds from testimony

presented at the November 4 and November 14 hearings, particularly the testimony of James R. Stoetzel, General Manager of Commuter Service of B & M, and Erwin R. Towle, General Superintendent of the Central Division, Freight of B & M, that B & M has made a sufficient showing of irreparable harm. Moreover, Peter W. Carr, Vice-President Finance Officer of the B & M, and Thomas J. Reilly, also Vice-President Finance Officer of the B & M, stated in affidavits that the B & M is in financial difficulty and dependent upon its ability to maintain a sufficient cash flow on a daily basis. They also stated that continued work stoppage would cost the B & M approximately $492,000 per day and make it extremely unlikely that the B & M could maintain sufficient cash flow to continue its operations.

Respondents argue in their memoranda of law and at the November 14 hearing that the November 4 work stoppage was not a strike over either a "major" or a "minor" dispute; to the contrary, they argue that it was a refusal to work under hazardous conditions. Refusals to work are governed by Section 10 of the FRSA, 45 U.S.C. § 441, as amended. Section 10 reads in pertinent part:

(b) Refusal to work under hazardous conditions

(1) A common carrier by railroad engaged in interstate or foreign commerce may not discharge or in any manner discriminate against any employee for refusing to work when confronted by a hazardous condition related to the performance of the employee's duties, if—

(A) the refusal is made in good faith and no reasonable alternative to such refusal is available to the employee;

(B) the hazardous condition is of such nature that a reasonable person, under the circumstances then confronting the employee, would conclude that—

(i) the condition presents an imminent danger of death or serious injury; and

(ii) there is insufficient time, due to the urgency of the situation, to eliminate the danger through resort to regular statutory channels; and

(C) the employee, where possible, has notified his employer of his apprehension of such hazardous condition and of his intention not to perform further work unless such condition is corrected immediately.

(c) Resolution of disputes

(1) any dispute, grievance, or claim arising under this section shall be subject to resolution in accordance with the procedures set forth in section 153 of this title.

Respondents contend that subsection (c)(1), which provides that "any dispute ... arising under this section shall be subject to resolution in accordance with the procedures set forth in section 153 of this title (Section 3 of the RLA)", means that Section 3 binding arbitration is the exclusive means for resolving disputes over refusals to work under hazardous conditions. Respondents also contend, without directing the Court to any supporting authority, that it is not for this Court to decide whether the respondents properly fulfilled the terms and conditions of the FRSA. That question, respondents argue, is exclusively a question for an arbitrator, selected in accordance with the procedures of Section 3, to answer.

This Court need not decide whether a district court could exercise jurisdiction over a dispute in which a party has properly invoked the protections of 45 U.S.C. § 441(b)(1) and (c)(1) because this is not such a case. The purpose of Section 10 of the FRSA is clear; it protects a railroad employee from retaliatory action by his employer for a refusal to work under hazardous conditions, after the employee has apprised the employer, where possible, of those conditions and informed the employer that he will not perform further work unless the conditions are made safe. The Legislative History to Section 10 of the FRSA states:

the legislation provides essential protection for the rights of railroad employees. The legislation ensures that certain pro-

tections of the Occupational Health and Safety Act (OSHA) are extended to railroad employees ...

The Committee has been informed of many complaints over the years of harassment in situations where a worker notifies authorities of violations, testifies in safety proceedings or institutes an action against a railroad. According to these complaints, harassment includes, but is not limited to, firing, verbal abuse, disproportionate dangerous assignments, and constant and unrelenting supervision. Such retaliatory actions by employers are not to be tolerated in the work place. Section 10 of the bill provides protection for the rail worker under these circumstances. The legislation would forbid discrimination against an employee for, among other things, reporting such violations. Similarly, the legislation would forbid a railroad from discriminating against an employee who refused to work in hazardous conditions presenting an imminent danger of death or serious injury. The Committee strongly believes employees should not be forced to choose between their lives and their livelihoods.

1980 U.S.Code Cong. and Adm.News 3830, 3832.

The purpose of Section 10 of the FRSA was to allow an employee or employees *personally* faced with a hazardous situation to walk off a job without the fear of retaliation by their employer. In this case, Committee Chairman Lenfest called a general strike of all B & M employees controlled by the UTU General Committee of Adjustment. At the hearing on November 4, the day of the strike, Lenfest could not tell District Judge Murray of any particular present or recent unsafe conditions, resulting from the failure of B & M to provide flagging, confronting any employee on the B & M system. Lenfest's testimony on November 4, which at best could be characterized as evasive, was that he called a general strike because of past instances where the B & M failed to provide flagging protection at construction sites along the B & M system. Ten days later, at the No-

vember 14 hearing, Lenfest said he was able to identify four or five locations along the B & M system where he had received reports in the past that there was inadequate flagging protection. Furthermore, two B & M employees, William Kempton and Leo MacDonald, testified that they had witnessed near-accidents resulting from inadequate flagging protection.

█ Section 10 of the FRSA was not intended to provide a shield to protect unions from injunctive relief against illegal general strikes. Respondents, after engaging in an illegal general strike, argue that this statute protects them from injunctive relief. The Court rules that the statute does not provide such protection. Even if the statute did apply to this case, respondents failed to comply with the requirements of subsection (b)(1)(C) to notify the B & M of any specific hazardous conditions existing on the railroad and of their intention not to perform further work unless such condition is corrected immediately. Section 10 plainly does not apply to the facts of this case.

The Court's decision in this case is not a deterrent to railroad employees *personally* faced with hazardous conditions invoking the protection of Section 10. Whenever an individual railroad employee is *personally* faced with imminent danger of death or serious injury and there is insufficient time to resort to regular statutory channels of dispute resolution, that employee may notify his employer that he refuses to perform further work unless the dangerous condition is corrected immediately. This is not to say, however, that one man's danger affords any basis at all in law or in fact for a system-wide strike by hundreds of other employees who are not personally exposed to that danger.

In addition to arguing that the B & M's complaint must be dismissed because of lack of subject matter jurisdiction and failure to state a claim, the respondents argue that this action is moot. At the November 14 hearing, Committee Chairman Lenfest testified that the B & M has represented to

him that any problems regarding the failure to provide flagging have been corrected. Therefore, the respondents argue that there would be no reason to stop working and an injunction would serve no purpose. The Court disagrees and rules that this case is not moot.

The fact that a party voluntarily discontinues an illegal activity does not necessarily moot an action. *United States v. Trans-Missouri Freight Association,* 166 U.S. 290, 17 S.Ct. 540, 41 L.Ed. 1007 (1897); *Walling v. Helmerich & Payne, Inc.,* 323 U.S. 37, 65 S.Ct. 11, 89 L.Ed. 29 (1944). In *United States v. W.T. Grant Co.,* 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953), the Supreme Court explained that if a case is held to be moot:

> [t]he defendant is free to return to his old ways. This, together with a public interest in having the legality of the practice settled, militates against a mootness conclusion. [citation omitted]. For to say that the case has become moot means that the defendant is entitled to a dismissal as a matter of right. [citation omitted]

In a case factually similar to the instant action, the Court of Appeals for the Seventh Circuit held that an appeal from an injunction against a strike was not mooted by the union's representation that it had lost interest in striking. *Chicago and Northwestern Transportation Co. v. United Transportation Union,* 656 F.2d 274, 277 (7th Cir.1981). *See also United States v. Generix Drug Corp., et al,* 460 U.S. 453, 457 n. 6, 103 S.Ct. 1298, 1300 n. 6, 75 L.Ed.2d 198 (1983) ("The possibility that respondent may change its mind in the future is sufficient to preclude a finding of mootness.").

The respondents argue that, under the facts of this case, they had a legal right to engage in a widespread work stoppage. If this Court declined to issue an injunction at this time, the respondents would be free to engage in another widespread work stoppage if another dispute over an alleged failure to provide flagging anywhere on the railroad develops. The Supreme Court has said that where a defendant continues to assert the legality of the challenged conduct, that is a factor which tends to show that the case is not moot. *Walling v. Helmerich & Payne, Inc.,* 323 U.S. 37, 42–43, 65 S.Ct. 11, 14, 89 L.Ed. 29 (1944). Here, the fact that respondents steadfastly maintain the legality of a general strike in this situation shows clearly that this case is not moot. I rule that the respondents have not carried their "heavy" burden of showing that "there is no reasonable expectation that the wrong will be repeated." *United States v. W.T. Grant Co.,* 345 U.S. 629, 633, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953).

In summary, I rule that petitioner has carried its burden of proving that it would probably prevail after a full hearing on the merits and will suffer irreparable harm if respondents are not enjoined. The record also shows that substantial harm would be visited upon a substantial segment of the public, namely the 25,000 commuters who rely on the B & M to get to and from their place of employment daily, as well as their employers and those who regularly rely on the B & M's freight service. Respondents have failed to show that they would suffer any irreparable harm if this clearly illegal strike is enjoined.

Order accordingly.