799 F.2d 795
 123 L.R.R.M. (BNA) 2558, 105 Lab.Cas. P 12,031
 BOSTON AND MAINE CORPORATION, Petitioner, Appellee,
v.
R.M. LENFEST, Jr., Individually and as Chairman of the
General Committee of Adjustment, United
Transportation Union (T), et al.,
Respondents, Appellants.
 No. 86-1039.
 United States Court of Appeals,
First Circuit.
 Sept. 2, 1986.
 
 John G. DiPersia with whom George J. Cahill, Jr. and Cahill, Goetsch & DiPersia, P.C., New Haven, Conn., were on brief, for respondents, appellants.
 Kinga M. LaChapelle, with whom John E. O'Keefe, Lynn, Mass., was on brief, for petitioner, appellee.
 Before COFFIN and BOWNES, Circuit Judges, and MALETZ,* Senior Judge.
 BOWNES, Circuit Judge.
 
 
 1
 Respondents-appellants, the General Committee of Adjustment of the United Transportation Union (the General Committee) and its individual officers and local chairmen, appeal an order of the district court preliminarily enjoining them from "engaging in a general strike or refusing to work" over alleged hazardous conditions on the railroad of petitioner-appellee Boston and Maine Corporation (B & M). Appellants claim that a work stoppage on November 4, 1985, which halted freight operations and left 25,000 commuters without service to Boston, was a valid refusal to work under hazardous conditions pursuant to Sec. 10(b) of the Federal Railroad Safety Act (FRSA), 45 U.S.C. Sec. 441(b) (1982). Appellants assert that a work stoppage by all United Transportation Union (UTU) conductors and trainmen was called because the conductors and trainmen were faced with a system-wide, life-threatening danger due to the B & M's failure to provide consistent flagging protection at construction sites along the railroad tracks.
 
 
 2
 The district court held that the work stoppage was not a protected FRSA Sec. 10 refusal to work, but was a strike over a "minor dispute" under the Railway Labor Act (RLA), 45 U.S.C. Sec. 153 (1982), and was properly enjoinable upon B & M's showing of irreparable harm. Brotherhood of Railroad Trainmen v. Chicago River & Indiana Railroad Co., 353 U.S. 30, 42, 77 S.Ct. 635, 641, 1 L.Ed.2d 622 (1957). The court held alternatively that even if the safety dispute was covered by Sec. 10 of the FRSA, appellants had failed to comply with its notice provision and therefore the strike was not protected by it. Boston and Maine Corp. v. Lenfest, 622 F.Supp. 942, 948 (D.Mass.1985). Appellants argue: (1) that the district court order should be overturned because the work stoppage was a Sec. 10 refusal to work; (2) that the question of compliance with the statute should not have been decided by the district court, but by the National Railroad Adjustment Board pursuant to Sec. 10(c) of the FRSA, 45 U.S.C. Sec. 441(c)(1), which makes any "dispute, grievance or claim" subject to resolution under the procedures set forth in 45 U.S.C. Sec. 153; and (3) that Sec. 4 of the Norris-LaGuardia Act, 29 U.S.C. Sec. 104 (1982), deprives the court of jurisdiction to enjoin a Sec. 10 work stoppage. As far as we can tell, this is a case of first impression.
 
 Background
 
 3
 The heart of this case is a dispute over the adequacy of flagging signals along the railroad tracks of the B & M. The B & M has freight operations in six Northeastern states, and passenger operations in three. At any given time private contractors are engaged in repair and maintenance work at several places along the line, and the locations shift day to day, even hour by hour. Flagging crews are assigned by the B & M to the construction sites so as to warn approaching trains and avert accidents between trains and construction machinery along the tracks. The B & M's policy is that no construction should proceed unless flagging is provided.
 
 
 4
 According to appellants, the safety issue arose when the General Committee Chairman, R.M. Lenfest, Jr. (Lenfest), began receiving "numerous" complaints in the months prior to November 1985 that train crews were passing construction sites where there was no flagging protection. The lack of flagmen followed no particular pattern, and sometimes a particular site would have flagmen one day and none the next. Lenfest claims to have repeatedly expressed his concern over the danger involved to Roger Audette, B & M's official in charge of assigning flagging crews. On November 3, 1985, Lenfest met with the local General Committee chairmen, and discussed the flagging situation. He testified that "it became obvious that any further discussion was an exercise in futility," and he was concerned that "to do nothing would be to invite disaster." He stated that he decided to act to protect the Union members. Lenfest called a work stoppage over the hazardous conditions, and beginning at 4:00 A.M. on November 4, the Union conductors and trainmen set up picket lines. Freight and commuter operations were disrupted by the work stoppage, and B & M sought a temporary restraining order in federal district court. After a hearing on November 4, the afternoon of the work stoppage, a temporary restraining order was entered by Judge Murray against the Union. B & M then filed a civil complaint seeking damages and a motion for a preliminary injunction. After a further hearing on November 14, Chief Judge Caffrey granted B & M's motion for a preliminary injunction in a memorandum and order issued on November 27, 622 F.Supp. 942.
 
 
 5
 Application of Sec. 10 of the FRSA to This Dispute
 
 
 6
 Section 10 of the FRSA states in pertinent part as follows:
 
 Protection and rights of employees
 
 7
 (a) Filing of complaints; institution of proceedings; testimony
 
 
 8
 A common carrier by railroad engaged in interstate or foreign commerce may not discharge or in any manner discriminate against any employee because such employee, whether acting in his own behalf or in a representative capacity, has--
 
 
 9
 (1) filed any complaint or instituted or caused to be instituted any proceeding under or related to the enforcement of the Federal railroad safety laws; or
 
 
 10
 (2) testified or is about to testify in any such proceeding.
 
 
 11
 (b) Refusal to work under hazardous conditions
 
 
 12
 (1) A common carrier by railroad engaged in interstate or foreign commerce may not discharge or in any manner discriminate against any employee for refusing to work when confronted by a hazardous condition related to the performance of the employee's duties, if--
 
 
 13
 (A) the refusal is made in good faith and no reasonable alternative to such refusal is available to the employee;
 
 
 14
 (B) the hazardous condition is of such a nature that a reasonable person, under the circumstances then confronting the employee, would conclude that--
 
 
 15
 (i) the condition presents an imminent danger of death or serious injury; and
 
 
 16
 (ii) there is insufficient time, due to the urgency of the situation, to eliminate the danger through resort to regular statutory channels; and
 
 
 17
 (C) the employee, where possible, has notified his employer of his apprehension of such hazardous condition and of his intention not to perform further work unless such condition is corrected immediately.
 
 
 18
 (2) The provision of this subsection shall not apply to security personnel employed by a railroad to protect persons and property transported by such railroad.
 
 
 19
 (c) Resolution of disputes
 
 
 20
 (1) Any dispute, grievance, or claim arising under this section shall be subject to resolution in accordance with the procedures set forth in section 153 of this title.
 
 
 21
 (2) In the case of any violation of subsection (a) or (b) of this section, the Adjustment Board (or any division or delegate thereof) or any other board of adjustment created under section 153 of this title shall, where appropriate, award backpay to the aggrieved employee and order such employee reinstated to his position.
 
 
 22
 45 U.S.C. Sec. 441.
 
 
 23
 The first issue is whether this was really a refusal to work under hazardous conditions. Appellees contend that "[b]ased on the evidence the court in effect found that the reason for the work stoppage was not the existence of a hazardous condition as claimed by respondents," and that therefore we cannot find that this was a Sec. 10(b) work stoppage unless the district court was clearly erroneous. There is no such explicit or implicit finding in the district court opinion. The only reason given by appellants for the work stoppage was that it was called because of the danger posed by inconsistent flagging. Nor do appellees allege any other reason for the work stoppage[1] In ruling that the work stoppage was a Railway Labor Act "minor" dispute, the district court expressly treated it as a strike over safety, referring to "the dispute over the B & M's alleged failure to provide flagging in this case" and to "a legal right to safe working conditions." Boston & Maine Corp. v. Lenfest, 622 F.Supp. at 946. The court also relied on Missouri-Kansas-Texas Railroad Co. v. Brotherhood Railroad Trainmen, 342 F.2d 298 (5th Cir.1965), which involved a concerted refusal to work under hazardous conditions. Boston and Maine Corp. v. Lenfest, 622 F.Supp. at 946.
 
 
 24
 The next issue is whether Sec. 10 applies to a collective refusal to work under hazardous conditions called by an employee bargaining unit, or whether it creates a right that can be exercised only by an employee acting individually. The district court held that Sec. 10 creates a right to refuse to work under hazardous conditions that can be exercised only individually, when an employee is personally faced with danger. The district court's holding was based on the literal terms of the statute. In urging affirmance appellees also point to the language of Sec. 10(b), arguing that since it refers to "employee" and not to "employees" or "employee representative," it confers only a personal right.
 
 
 25
 Appellants make two valid arguments for rejecting a literal reading of the statute. First, they argue that whether or not the statute refers to employee or employees is irrelevant because 1 U.S.C. Sec. 1 (1982), which governs the construction of federal statutes, states in pertinent part:
 
 
 26
 In determining the meaning of any Act of Congress, unless the context indicates otherwise--
 
 
 27
 words importing the singular include and apply to several persons, parties, or things.
 
 
 28
 Appellants' second argument is that even though the statute is silent as to union representatives, this court must interpret it based on the "practical realities of railroading" and the nature of the danger involved. Because the inconsistent flagging could result in a train not being warned of construction at any point in the B & M system, every conductor and trainman was put at risk. But since many of the train crews had not yet encountered an unflagged construction site, they could not be expected to know the extent of the danger they faced. It was only the General Committee, which had gathered flagging information from B & M's entire operations, that understood the nature and extent of the system-wide danger posed by inconsistent application of the railroad's flagging policy.[2]
 
 
 29
 First, we find that since the context of Sec. 10 does not confine the word "employee" to the singular it applies to groups of employees as well as an individual employee. 1 U.S.C. Sec. 1.
 
 
 30
 Second, we recognize that "a statute's plain language is the primary indicator of its meaning," Massachusetts Financial Services, Inc. v. Securities Investor Protection Corp., 545 F.2d 754, 756 (1st Cir.1976), cert. denied, 431 U.S. 904, 97 S.Ct. 1696, 52 L.Ed.2d 388 (1977), but in light of the stated purpose and design of Sec. 10 its language is not so "plain" as to control, without more, the precise question posed by the facts of this case. See United States v. Mariea, 795 F.2d 1094, 1097-98 (1st Cir.1986); cf. Landreth Timber Co. v. Landreth, 471 U.S. 681, 105 S.Ct. 2297, 2301, 85 L.Ed.2d 692 (1985) (starting point in statutory construction is language of statute); Blum v. Stenson, 465 U.S. 886, 896, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1984) (where resolution of question of federal law turns on statute and intention of Congress, Court looks first to statutory language and then to legislative history if statutory language is unclear); Bob Jones University v. United States, 461 U.S. 574, 586, 103 S.Ct. 2017, 2025, 76 L.Ed.2d 157 (1983) ("a court should go beyond the literal language of a statute if reliance on that language would defeat the plain purpose of the statute"). Congress expressed its purpose starkly and succinctly: "The Committee strongly believes employees should not be forced to choose between their lives and their livelihoods." H.R.Rep. No. 1025, 96th Cong., 2d Sess. 8, reprinted in 1980 U.S. Code Cong. & Ad. News 3830, 3832. And the Supreme Court has instructed that "safety legislation is to be liberally construed to effectuate the congressional purpose." Whirlpool Corp. v. Marshall, 445 U.S. 1, 13, 100 S.Ct. 883, 891, 63 L.Ed.2d 154 (1980) (citing cases). We therefore construe the statute taking its purpose and legislative history as well as its words into consideration.
 
 
 31
 The main purpose of the statute is to allow employees faced with the risk of death or serious injury to refuse to work without fear of retaliatory firing by the employer. On its face, Sec. 10 apparently assumes that an employee will be in a position to recognize the risk. Here, however, an individual employee working on a train was not in a position to know about the risk until it was too late or the danger has passed. Only the Union officials who were privy to the system-wide defective and inconsistent flagging protection were in a position to recognize the potential danger to which all employees working on trains were exposed. To hold that union leaders can call for a concerted work stoppage in such circumstances only at the risk of being found liable for instigating an illegal strike is to place them in the position of having to choose between their own welfare and the lives of the employees. This is contrary to what Congress intended. We hold that where hazardous working conditions are the result of a system-wide failure to provide adequate protection so that employees are in danger of death or serious injury without knowing it, and the Union is aware of such danger, the Union may call a concerted work stoppage under Sec. 10(b) to protect the lives and safety of the employees.
 
 
 32
 We find further support for our holding in the Supreme Court's reading of an analogous labor statute, Sec. 502 of the Labor Management Relations Act, 29 U.S.C. Sec. 143 (1982). Section 502 provides in part that
 
 
 33
 the quitting of labor by an employee or employees in good faith because of abnormally dangerous conditions for work at the place of employment of such employee or employees [shall not] be deemed a strike under this chapter.
 
 
 34
 The Court interpreted this language, which like Sec. 10(b) is silent on the role of unions, to include a right to a work stoppage called by a union. The Court stated in an eight-member majority:
 
 
 35
 We agree ... that a work stoppage called solely to protect employees from immediate danger is authorized by Sec. 502 and cannot be the basis for either a damages award [for breach of a contractual no-strike agreement] or a Boys Markets injunction [to enjoin a strike and order arbitration where arbitration is provided for in the collective bargaining agreement].
 
 
 36
 Gateway Coal Co. v. United Mine Workers of America, 414 U.S. 368, 385, 94 S.Ct. 629, 640, 38 L.Ed.2d 583 (1974). Additional support is also found in a case where the majority of a panel of the Sixth Circuit rejected a conclusion by one judge, similar to that of the district court in this case, that Sec. 502 is "addressed solely to the rights of individuals" because it "does not mention a labor union." Clark Engineering & Construction Co. v. United Brotherhood of Carpenters and Joiners of America, 510 F.2d 1075, 1079 (6th Cir.1975) (Weick, J.). Relying on Gateway, two judges on the panel agreed that under Sec. 502 it is not an impermissible secondary boycott for a union to protest hazardous job conditions by picketing at a work entrance used by nonunion workers. Id. at 1084 (McCree, J., concurring; Edwards, J., dissenting).
 
 
 37
 The next issue is jurisdictional. The district court found that "[e]ven if the statute [Sec. 10(b) ] did apply to this case, respondents failed to comply with the requirement of subsection (b)(1)(C) to notify the B & M of any specific hazardous conditions existing on the railroad and of their intention not to perform further work unless such condition is corrected immediately." Boston and Maine Corp. v. Lenfest, 622 F.Supp. at 948. The question is whether the district court had jurisdiction to make this finding.
 
 
 38
 Section 10(c) of the FRSA states plainly that "[a]ny dispute, grievance, or claim arising under this section shall be subject to resolution in accordance with the procedures set forth in section 153 of this title." 45 U.S.C. Sec. 441(c) (emphasis added). It does not state "any valid dispute," or "any dispute for which the conditions of this section are met." Section 3 (45 U.S.C. Sec. 153) provides for the settlement of railroad labor disputes by the National Railroad Adjustment Board. The House Report that accompanied the FRSA is clear, "[t]he Committee intends this to be the exclusive means for enforcing this section." H.R.Rep. No. 1025, 1980 U.S. Code Cong. & Ad.News at 3841. If the applicability of Section 10 of the FRSA depended on the findings of fact made by a district court, this would render the Sec. 10(c) requirement meaningless. The Board would have to follow the district court's findings of fact and could do nothing but determine a remedy. Such a bifurcated resolution of disputes over hazardous working conditions would vitiate a provision designed to provide speedy and final nonjudicial resolution. Accordingly, we find that the district court was without jurisdiction to make findings of fact in this case as to the adequacy of notice given to the B & M. This entire dispute, including the nature of the hazard faced, whether the Committee complied with the statutory requirements of notice, and the retaliatory actions of the B & M in firing the leaders of the work stoppage and disciplining others, must be submitted to the National Railroad Adjustment Board under 45 U.S.C. Sec. 153.
 
 Availability of Injunctive Relief
 
 39
 Section 4 of the Norris-LaGuardia Act deprives federal courts of "jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute." 29 U.S.C. Sec. 104.[3] Despite the broad, explicit language of the Act the Supreme Court has construed two major statutes to grant implicitly to federal courts jurisdiction to issue labor injunctions.
 
 
 40
 In Brotherhood of Railroad Trainmen v. Chicago River & Indiana Railroad Co., 353 U.S. at 42, 77 S.Ct. at 641, the Court held that there is jurisdiction to issue injunctive relief where the RLA applies to a dispute and provides the process for resolving it. Consequently, during either a Sec. 3 (45 U.S.C. Sec. 153) "minor" dispute[4] or a Sec. 6 (45 U.S.C. Sec. 156) "major" dispute[5] resolution proceeding under the RLA, a district court may enjoin a strike and prevent either party from altering the status quo during the pendency of the proceedings. Carbone v. Meserve, 645 F.2d 96, 98 (1st Cir.), cert. denied, 454 U.S. 859, 102 S.Ct. 312, 70 L.Ed.2d 156 (1981). If the Sec. 6 nonbinding procedures for a major dispute are exhausted without resolution, then under the Norris-LaGuardia Act the district court no longer has jurisdiction to continue to enjoin the strike or employer retaliation. Missouri-Kansas-Texas Railroad Co. v. Brotherhood of Railroad Trainmen, 342 F.2d at 299. Since resolution of a minor dispute is by binding arbitration, however, an injunction effectively ends all prospects of a strike. Carbone v. Meserve, 645 F.2d at 98.
 
 
 41
 In Boys Markets, Inc. v. Retail Clerks Union, Local 770, 398 U.S. 235, 253, 90 S.Ct. 1583, 1593, 26 L.Ed.2d 199 (1970), the Supreme Court held that there is jurisdiction to issue injunctive relief where a labor dispute is covered by an agreement to arbitrate governed by Sec. 301 of the Labor Management Relations Act.[6] In such a case the district court may issue an injunction "under ordinary principles of equity" pending arbitration of the dispute according to the agreement. Id. at 254, 90 S.Ct. at 1594.
 
 
 42
 In this case the district court asserted jurisdiction to enjoin the appellants' work stoppage because it held the dispute at issue was a minor dispute under the RLA. The district court relied on the case of Missouri-Kansas-Texas Railroad Co. v. Brotherhood of Railroad Trainmen, 342 F.2d 298, in finding this to be a minor dispute. Although the M-K-T Railroad case did hold squarely that a union-wide walkout over safety was a "minor" dispute and therefore enjoinable, it was decided some fifteen years before the enactment of the FRSA. If a work stoppage is a protected refusal to work because of hazardous conditions under Sec. 10(b) of the FRSA, it cannot also be a minor dispute over the terms and conditions of employment under Sec. 3 of the RLA. Because resolution of this case is governed by Sec. 10(c) of the FRSA and not Sec. 3 of the RLA, the district court did not have jurisdiction to grant an injunction under the RLA. And, since the dispute in this case is not arbitrable under a collective bargaining agreement between the parties, there is no jurisdiction to enter a Boys Markets injunction. See Buffalo Forge Co. v. United Steelworkers of America, AFL-CIO, 428 U.S. 397, 403-04, 96 S.Ct. 3141, 3145-46, 49 L.Ed.2d 1022 (1976). If there is jurisdiction to issue an injunction it must come from the FRSA.
 
 
 43
 In the Chicago River and Boys Markets cases, the Supreme Court found limited federal jurisdiction to enter labor injunctions despite Sec. 4 of the Norris-LaGuardia Act in order to accommodate Sec. 4 and its purposes with newer federal labor statutes and policies. Boys Markets, 398 U.S. at 250, 90 S.Ct. at 1592; Chicago River, 353 U.S. at 40, 77 S.Ct. at 640. In Boys Markets, the Court carefully explained why the history of the enactment of labor legislation made it "the task of the courts to accommodate, to reconcile the older [labor] statutes with the more recent ones." Congressional labor policy had shifted, explained the Court, "without extensive revision of many of the older enactments." 398 U.S. at 250-51, 90 S.Ct. at 1592-93. In Boys Markets the task was to accommodate "the literal terms of Sec. 4 of the Norris-LaGuardia Act ... to the subsequently enacted provisions of Sec. 301(a) of the Labor Management Relations Act and the purposes of arbitration." Id. at 250, 90 S.Ct. at 1592. Court held that where an employer sought to enforce an agreement to arbitrate against a union that had gone on strike in violation of a no-strike agreement, injunctive relief would be available for use by a federal court to halt such a strike and prevent irreparable injury. The Court reasoned that
 
 
 44
 the unavailability of equitable relief in the arbitration context presents a serious impediment to the congressional policy favoring the voluntary establishment of a mechanism for the peaceful resolution of labor disputes, [and] the core purpose of the Norris-LaGuardia Act is not sacrificed by the limited use of equitable remedies to further this important policy ....
 
 
 45
 Id. at 253, 90 S.Ct. at 1593. In the earlier Chicago River case the Court had accommodated Sec. 4 of the Norris-LaGuardia Act to Sec. 3 of the Railway Labor Act. As explained by Justice Brennan in Boys Markets, the Court in Chicago River was
 
 
 46
 confronted with a peaceful strike which violated the statutory duty to arbitrate imposed by the Railway Labor Act. The Court concluded that a strike in violation of a statutory arbitration duty was not the type of situation to which the Norris-LaGuardia Act was responsive, that an important federal policy was involved in the peaceful settlement of disputes through the statutorily mandated arbitration procedure, that this important policy was imperiled if equitable remedies were not available to implement it, and hence that Norris-LaGuardia's policy of nonintervention by the federal courts should yield to the overriding interest in the successful implementation of the arbitration process.
 
 
 47
 Boys Markets, 398 U.S. at 251-52, 90 S.Ct. at 1593.
 
 
 48
 We think the underlying principles of Chicago River and Boys Markets apply to this case. Pursuant to the teaching of the Supreme Court, we must accommodate the venerable Norris-LaGuardia Act with the purpose of the recently enacted FRSA. Congress intended that Sec. 10(b) disputes arising because of refusals to work under hazardous conditions be submitted under Sec. 10(c) to swift resolution by the nonjudicial, binding procedures of Sec. 3 of the RLA. But when a railroad's entire work force exercises its rights under Sec. 10 to refuse to work under hazardous conditions, the work stoppage takes on the character of a contest of economic power, and the availability of arbitration procedures to mediate the dispute may be effectively nullified by the economic and social pressures brought to bear. The present case presents this problem because the B & M is in a precarious financial condition and claims it would quickly become insolvent if a total work stoppage were to continue. Thus, if an injunction were not available in this case, and B & M collapsed or was forced by pressure to concede to the Union, the dispute would never be resolved as Congress intended. As the Supreme Court has said,
 
 
 49
 [r]elegating safety disputes to the arena of economic combat offers no greater assurance that the ultimate resolution will ensure employee safety. Indeed, the safety of the workshop would then depend on the relative economic strength of the parties rather than on an informed and impartial assessment of the facts.
 
 
 50
 Gateway Coal Co. v. United Mine Workers of America, 414 U.S. at 379, 94 S.Ct. at 637. Only the availability of injunctive relief can ensure that the FRSA will operate consistently with its purpose--which is to give employees the right to avoid hazardous conditions on the railroad, and to channel any such dispute into binding arbitration. The core purpose of the Norris-LaGuardia Act, which was to protect the young union movement from interference by federal courts guided only by their own concepts of labor-management relations "is not sacrificed by the limited use of equitable remedies to further [the] important [congressional] policy" behind the FRSA. Cf. Boys Markets, 398 U.S. at 253, 90 S.Ct. at 1594.
 
 
 51
 We hold that the Norris-LaGuardia Act does not deprive federal courts of jurisdiction to order injunctive relief to prevent a refusal to work by an entire work force under Sec. 10 of the FRSA from becoming economic combat and thereby preventing resolution of the dispute under the statutory procedures. The standard principles of equity apply to a request for injunctive relief in this setting:
 
 
 52
 whether breaches are occurring and will continue, or have been threatened and will be committed; whether they have caused or will cause irreparable injury to the employer; and whether the employer will suffer more from the denial of an injunction than will the union from its issuance.
 
 
 53
 Boys Markets, 398 U.S. at 254, 90 S.Ct. at 1594 (quoting Sinclair Refining Co. v. Atkinson, 370 U.S. 195, 228, 82 S.Ct. 1328, 1346 (1962) (Brennan, J., dissenting)).
 
 
 54
 An injunction in a railway labor dispute over hazardous conditions is an extraordinary remedy. When a Sec. 10 refusal to work occurs involving only a few employees it is unlikely that a railroad will be able to show irreparable harm will result if the stoppage is not enjoined. And when an injunction against a work stoppage is sought by a railroad, the court must also consider the alleged hazardous condition facing the employees. An injunction should not issue if it forces the employees, upon pain of contempt, to return to work and face a hazardous condition that the FRSA was intended to allow them to avoid. In most cases where an injunction enters, then, some provision must be made for protecting the employees. Cf. Hanna Mining Company v. United Steelworkers of America, 464 F.2d 565 (8th Cir.1972) (per curiam) (a carefully crafted Boys Markets injunction was issued in the context of a safety dispute that enjoined a union walkout over hazardous conditions, enjoined continuance of the hazardous conditions, and ordered resort to arbitration). In this case, since the inconsistent flagging of construction sites charged by the Union could result in fatal crashes, the injunction should have included a provision ordering the railroad to take steps to ensure that there would be no work at construction sites unless adequate flagging was provided. We note that the appellants reported to B & M officials a near-hit between a train and construction machinery at an unflagged site as late as November 12, well after the temporary restraining order had halted the strike on November 4. Since an order to fill flagging assignments or halt construction only requires B & M to comply with its stated policy it imposes no significant burden on it. And since a collision caused by lack of flagging could involve rush hour commuter trains, the public interest will be served by such an order.
 
 
 55
 Although there is some indication in the record that the B & M has corrected the flagging problems, and the Union claims it has no more reason to strike, the injunction issue is not moot. We agree with the district court that these facts did not moot the action because the Union is free to call a work stoppage again. "The possibility that [a party] may change its mind in the future is sufficient to preclude a finding of mootness." United States v. Generix Drug Corp., 460 U.S. 453, 456-57 n. 6, 103 S.Ct. 1298, 1300 n. 6, 75 L.Ed.2d 198 (1983); see United States v. Concentrated Phosphate Export Association, 393 U.S. 199, 203, 89 S.Ct. 361, 364, 21 L.Ed.2d 344 (1968); Chicago and Northwestern Transportation Co. v. United Transportation Union, 656 F.2d 274, 277 (7th Cir.1981). We also find that without an injunction the B & M would be free in the future to allow inconsistent flagging practices. The need to enjoin any future unsafe flagging practices is therefore not moot.
 
 
 56
 We hold that this was not an illegal strike, but was a protected refusal to work under hazardous conditions pursuant to Sec. 10(b) of the FRSA and that the district court was without jurisdiction to make findings of fact. The district court did have jurisdiction to issue a preliminary injunction pending resolution of this dispute by the National Railroad Adjustment Board. The injunction shall be modified so that it (1) requires the B & M to follow its stated policy of flagging at all construction sites on or near the tracks and (2) enjoins the Union from calling a work stoppage so long as the B & M follows this policy. The dispute is referred to the National Railroad Adjustment Board pursuant to Sec. 3 of the RLA, 45 U.S.C. Sec. 153. The B & M's action for damages is dismissed.
 
 
 57
 So ordered. No costs.
 
 
 
 *
 Of the United States Court of International Trade, sitting by designation
 
 
 [1]
 Approximately six months earlier, on May 3, 1985, the Union had filed a Railway Labor Act Sec. 6 notice, 45 U.S.C. Sec. 156 (1982), seeking to revise its collective bargaining agreement with the B & M to provide that only United Transportation Union members be assigned as flagmen, but it has not been suggested to us that the safety issue and the work stoppage that are the subject of this appeal are part of that Sec. 6 dispute
 
 
 [2]
 Appellants also advanced a third argument based on an alleged connection between the FRSA and OSHA. We see no need to discuss this argument
 
 
 [3]
 The provision states more fully:
 No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons participating or interested in such dispute (as these terms are herein defined) from doing, whether singly or in concert, any of the following acts:
 (a) Ceasing or refusing to perform any work ...
 (i) Advising, urging, or otherwise causing or inducing without fraud or violence the acts heretofore specified....
 29 U.S.C. Sec. 104.
 
 
 [4]
 A "minor" dispute is one which
 contemplates the existence of a collective agreement already concluded or ... a situation in which no effort is made to bring about a formal change in terms or to create a new one. The dispute relates either to the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case. In the latter event the claim is founded upon some incident of the employment relation, or asserted one.... In either case the claim is to rights accrued, not merely to have new ones created for the future.
 Elgin, Joliet & Eastern Railway Co. v. Burley, 325 U.S. 711, 723, 65 S.Ct. 1282, 1290, 89 L.Ed. 1886 (1945).
 
 
 [5]
 A "major" dispute
 relates to disputes over the formation of collective agreements or efforts to secure them. They arise when there is no such agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy. They look to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past.
 Elgin, Joliet & Eastern Railway Co. v. Burley, 325 U.S. at 723, 65 S.Ct. at 1290.
 
 
 [6]
 Section 301(a) states:
 Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.
 29 U.S.C. Sec. 185(a) (1982).