**CONSOLIDATED RAIL CORP.**

v.

**UNITED TRANSPORTATION UNION, et al.**

**Civil Action No. 95–5228.**

United States District Court,
E.D. Pennsylvania,
Civil Division.

Nov. 19, 1996.

---

Robert S. Hawkins, Pepper, Hamilton & Scheetz, Philadelphia, PA, for Plaintiff.

G. Sander Davis, Davis and Myers, Philadelphia, PA, Norton N. Newborn, Norton N. Newborn Co., Cleveland, OH, for United Transportation Union General Committee of Adjustment (PRR).

Allan J. Sagot, Philadelphia, PA, Lawrence M. Mann, Alper and Mann, P.C., Washington, D.C., Emil Di Nardo, Di Nardo, Di Nardo and Lukasik, Buffalo, NY, for Jack Arnold, Vice General Chairman, General Committee of Adjustment (PRR), United Transportation Union, Local 1418, Ron Souder, Local Chairman.

**170**

### MEMORANDUM

BARTLE, District Judge.

Plaintiff Consolidated Rail Corporation ("Conrail") has brought this action against certain labor unions and their leaders for instituting and threatening strikes or work stoppages over "minor disputes" in violation of the Railway Labor Act, 45 U.S.C. §§ 151–188. Conrail prays for declaratory and injunctive relief. It also seeks damages it allegedly incurred in connection with the strike of June 8, 1995.

Before the court is the renewed motion of defendants Jack Arnold ("Arnold"), United Transportation Union Local 1418 ("Local 1418), and Ron Souders ("Souders") to dismiss the second amended complaint[1] or in the alternative to stay the proceedings. Although the defendants seek to dismiss or stay the entire action, their motion focuses on the only dispute for which Conrail seeks damages, the June 8, 1995 strike. Specifically, the defendants contend that § 10 of the Federal Railroad Safety Act ("FRSA"), 49 U.S.C. § 20109, requires that this court defer in the first instance to the National Railroad Adjustment Board ("NRAB") with respect to that strike. Conrail's cross-motion for partial summary judgment on the defendants' affirmative defense under the FRSA is also pending.[2]

According to the second amended complaint, the defendants instigated a series of unlawful strikes, threatened strikes, and work stoppages over a multi-year period at Conrail's Conway Yard in Conway, Pennsylvania. The incident which spurred the present motion occurred on June 8, 1995, when certain members of Local 1418 working at the Conway Yard struck for approximately two hours. In their present motion, submitted after the close of discovery, the defendants now specifically assert that the strike

was called to protest hazardous conditions at the Conway Yard. Specifically, they claim that imminent danger of death or serious injury existed because of the presence of multitudinous rats, rat carcasses, and rat burrows. They support their assertion with at least five depositions which discuss in some detail the alleged rat infestation and with several contemporaneous documents which confirm the existence of a rodent problem.

■ Conrail maintains that the June 8, 1995 strike was impermissible as it concerned a "minor dispute." Railroad employees may not strike over minor disputes, which must be submitted to compulsory arbitration. *See Conrail v. Railway Labor Executives' Ass'n*, 491 U.S. 299, 303–04, 109 S.Ct. 2477, 2480–81, 105 L.Ed.2d 250 (1989); *Pittsburgh & Lake Erie R.R. Co. v. Railway Labor Executives' Ass'n*, 491 U.S. 490, 513, 109 S.Ct. 2584, 2598, 105 L.Ed.2d 415 (1989); *Gen. Comm. of Adj., United Transp. Union v. CSX R.R. Corp.*, 893 F.2d 584, 591 (3d Cir.1990). Conrail argues that the strike had nothing to do with safety but instead was called to protest the possibility of disciplinary action against a Conrail employee. Conrail suggests that safety could not have been the real issue since the strike was called off within a few hours—well before any of the allegedly dangerous conditions could have been rectified. In sum, it is the position of Conrail that the issue of safety is simply being used as a pretext for an otherwise illegal strike.

The defendants counter that this case is covered by the FRSA and that under the FRSA any questions regarding the validity of their safety concerns must be resolved by the NRAB, not this court. Conrail responds that even if the strike did concern safety, the FRSA does not apply because the defendants

---

1. Although the renewed motion actually addresses the first amended complaint, we will consider it in reference to the second amended complaint. The defendants did not oppose Conrail's motion to amend the first amended complaint, which we granted on November 4, 1996. Moreover, the second amended complaint varies little from the first, simply setting out the facts of two more work disputes and correcting the dates of three others. Finally, this treatment will not prejudice

the defendants, as the gravamen of their motion—the strike on June 8, 1995—receives identical treatment in each amended complaint.

2. In their answer to the amended complaint, the defendants pleaded as an affirmative defense that "plaintiff's claims should be before the National Railroad Adjustment Board pursuant to the provisions of 49 U.S.C. § 20109(b) and (c)."

disregarded that statute's procedural requirements.

The FRSA, enacted in 1970, strives to "promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." 49 U.S.C. § 20101. This concern for safety extends to railroad employees as well as to railroad passengers. After the FRSA's passage, however, it came to Congress' attention that railroad workers who complained about safety conditions often suffered harassment, retaliation, and even dismissal. *See* Federal Railroad Safety Authorization Act of 1980, Pub.L. No. 96–423, *reprinted in* 1980 U.S.C.C.A.N. 3830, 3832. In 1980, Congress attempted to rectify this situation by passing § 10 of the FRSA.[3] The goal of § 10 was to end "discrimination against an employee for, among other things, reporting such [safety] violations." *Id.* The employee protection section of the FRSA reads in pertinent part as follows:

**(b) Refusing to work because of hazardous conditions**—(1) A railroad carrier engaged in interstate or foreign commerce may not discharge or in any way discriminate against an employee for refusing to work when confronted by a hazardous condition related to the performance of the employee's duties, if—

(A) the refusal is made in good faith and no reasonable alternative to the refusal is available to the employee;

(B) a reasonable individual in the circumstances then confronting the employee would conclude that—

(i) the hazardous condition presents an imminent danger of death or serious injury; and

(ii) the urgency of the situation does not allow sufficient time to eliminate the danger through regular statutory means; and

(C) the employee, where possible, has notified the carrier of the hazardous condition and the intention not to perform further work unless the condition is corrected immediately.

**3.** This act again was amended in 1994. The controlling purpose of the 1994 amendment simply was to codify and restate all transportation

(2) This subsection does not apply to security personnel employed by a carrier to protect individuals and property transported by railroad.

49 U.S.C. § 20109. The Act also provides for the NRAB to resolve these disputes:

**(c) Dispute resolution**—A dispute, grievance, or claim arising under this section is subject to resolution under section 3 of the Railway Labor Act (45 U.S.C. 153). In a proceeding by the National Railroad Adjustment Board, a division or delegate of the Board, or another board of adjustment established under section 3 to resolve the dispute, grievance, or claim, the proceeding shall be expedited and the dispute, grievance, or claim shall be resolved not later than 180 days after it is filed. If the violation is a form of discrimination that does not involve discharge, suspension, or another action affecting pay, and no other remedy is available under this subsection, the Board, division, delegate, or other board of adjustment may award the employee reasonable damages, including punitive damages, of not more than $20,000.

*Id.* This dispute resolution mechanism is mandatory. When Congress added the employee safety provisions in 1980, it intended that they were to be enforced "*solely* through the existing grievance procedures provided for in Section 3 of the Railway Labor Act, including the Adjustment Board [and] its divisions...." H.R.Rep. 1025, 96th Cong.2d Sess. 4 (1980), *reprinted in* 1980 U.S.C.C.A.N. 3830, 3832. The present dispute concerns the applicability of these grievance procedures to the June 8, 1995 strike.

This case does not present the typical employee protection situation contemplated by Congress. The language and legislative history of the FRSA envision a worker refusing to work because of what he or she perceives to be a hazardous condition presenting an "imminent danger of death or serious injury" and then facing retaliation by the railroad through docking of pay, transfer to an unfavorable work assignment, or dismissal. 49 U.S.C. § 20109(b)(B)(i). If the railroad takes

laws at Title 49 of the United States Code, not to enact any substantive changes. *See* S.Rep. 103–265, *available in* WESTLAW, 1994 WL 261999.

such adverse action, the worker may seek relief from the NRAB, which has the power to award damages if the worker's complaint is valid.

There is no contention in the present action that any workers were disciplined as a result of the June 8, 1995 strike. Rather, the defendants first raised the issue of the FRSA and the need for NRAB resolution in their first motion to dismiss or stay the action filed some three months after the strike ended. Moreover, the defendants who seek a stay are not working railroad employees who have been disciplined. In contrast, they are officers of the local and international unions as well as the local union itself, which is an unincorporated association of all its members. *See, e.g., United Mine Workers of America v. Coronado Coal Co.,* 259 U.S. 344, 383–86, 42 S.Ct. 570, 573–75, 66 L.Ed. 975 (1922). If one accepts the defendants' argument that the June 8, 1995 strike was premised on safety concerns, Conrail's lawsuit fairly could be characterized as retaliation against the union, and hence its members, for engaging in protected activity at the Conway Yard. Such retaliation, if it occurred, would violate § 10 of the FRSA, which is designed to prevent workers from loss or penalty for refusing to work because of hazardous conditions. *See* 49 U.S.C. § 20109. If the FRSA thereby is implicated, this dispute rightfully should be in front of the NRAB, not this court.

The First Circuit has addressed the interplay between a district court and the NRAB in a factually similar case. In *Boston and Maine Corp. v. Lenfest,* 799 F.2d 795 (1st Cir.1986), *cert. denied,* 479 U.S. 1102, 107 S.Ct. 1333, 94 L.Ed.2d 184 (1987), railroad workers of the Boston and Maine Corporation ("B & M") complained that the flagging signals along the B & M tracks were inadequate, causing a dangerous condition. This was brought to the attention of R.M. Lenfest, the Chairman of the United Transportation Union General Committee of Adjustment. When B & M disregarded Lenfest's protestations, he organized a work stoppage. B & M then sought, and obtained, a preliminary injunction in the district court which ended the strike. The district court concluded that the FRSA did not apply to the case as the "respondents failed to comply with the requirement of subsection (b)(1)(C) to notify the B & M of any specific hazardous conditions existing on the railroad and of their intention not to perform other work unless such condition is corrected immediately." *Boston and Maine Corp. v. Lenfest,* 622 F.Supp. 942, 948 (D.Mass.1985). Conrail urges this court to reach a similar conclusion in the present action.

On appeal, the First Circuit upheld the injunction as necessary to prevent irreparable harm to the railroad. It emphasized, however, that the district court's jurisdiction extended only to the issuance of the preliminary injunction "pending resolution of th[e] dispute by the National Railroad Adjustment Board." *Id.* at 804. The district court exceeded its jurisdiction, the First Circuit held, when it discounted the role of the FRSA:

> [i]f the applicability of Section 10 of the FRSA depended on the findings of fact made by a district court, this would render the [NRAB] requirement meaningless. The Board would have to follow the district court's findings of fact and could do nothing but determine a remedy. Such a bifurcated resolution of disputes over hazardous working conditions would vitiate a provision designed to provide speedy and final nonjudicial resolution.

In light of these policy considerations, the *Lenfest* court concluded that:

> ... the district court was without jurisdiction to make findings of fact in this case as to the adequacy of notice given to the B & M. This entire dispute, *including the nature of the hazard faced [and] whether the Committee complied with the statutory requirements of notice* ... must be submitted to the National Railroad Adjustment Board under 45 U.S.C. § 153.

*Id.* (emphasis added).

The ramifications of *Lenfest* were explained by the District Court of Maine in the very thoughtful opinion of *Springfield Terminal Ry. Co. v. United Transp. Union,* 767 F.Supp. 333 (D.Me.1991). In *Springfield Terminal,* members of the United Transportation Union ("UTU") commenced a work stoppage against the Springfield Terminal

("ST"). ST allegedly forced employees involved in the stoppage to resign. *Id.* at 335. The UTU asserted that the FRSA prohibited such discipline as the work cessation concerned hazardous working conditions. ST countered, as does Conrail in the present action, that non-safety issues provoked the stoppage and that safety was a mere pretext for the actions. *Id.* at 335, 342. UTU sought injunctive relief in federal district court. The district court denied UTU's motion for a preliminary injunction on the ground that "resolution of the issues presented by the UTU was entirely dependent on factfinding statutorily committed to an arbitral tribunal." *Id.* at 335. The dispute was sent to the NRAB.

The NRAB[4] issued a decision awarding back pay to the disciplined workers. *Id.* ST appealed this award to the district court, contending that the "pretext" issue should have been decided in the first instance by the court, not the NRAB. *Id.* at 342. The district court disagreed. It concluded: "[t]he pretext question is plainly a factual determination, requiring consideration of evidence about the existence of a hazard and the motives of the strikers ... the question of pretext posited by ST requires factfinding which must be left to the arbitration board." *Id.* at 342. The court appropriately stressed that under the FRSA "arbitration is the *explicit choice of Congress,* not the result of an agreement between the parties." *Id.* at 338 (emphasis added).

Conrail cites a decision of the Southern District of New York for the proposition that, contrary to *Lenfest, Springfield Terminal,* and the apparent dictate of Congress, we need not defer to the NRAB when a work stoppage is allegedly precipitated by concern for the safety of railroad workers. *See Metro–North Commuter R.R. Co. v. Local 808, Int'l Bhd. of Teamsters,* 1988 WL 103359 (S.D.N.Y.1988). In *Metro–North,* the court set forth its findings of fact and conclusions of law after it heard argument on a prelimi-

nary injunction. As the First Circuit explained in *Lenfest,* a district court faced with a potential FRSA issue properly may hold an evidentiary hearing on a preliminary injunction. *Lenfest,* 799 F.2d at 804. However, the resulting factfinding only has relevance for consideration of the injunction. The dispute ultimately must be resolved by the NRAB. *Id.* at 800, 804. The *Metro–North* court never claimed to be deciding anything beyond the preliminary injunction motion, nor did it expressly or impliedly rebuff the NRAB's jurisdiction. The *Metro–North* decision, then, actually is consistent with other FRSA cases.

We believe these cases were correctly decided. If the facts presented by a union or any of its members, taken on their face as true, show that a hazardous condition was the basis for the strike, the FRSA requires this court to defer in the first instance to the decision of the NRAB. An exception to such deference exists only where preliminary injunctive relief is necessary to prevent immediate irreparable harm. *See Lenfest,* 799 F.2d at 804. *Springfield Terminal,* 767 F.Supp. at 343; *see also United Steelworkers v. American Mfg. Co.,* 363 U.S. 564, 568, 80 S.Ct. 1343, 1346, 4 L.Ed.2d 1403 (1960); *Bristol Farmers Mkt. v. Arlen Realty & Dev. Corp.,* 589 F.2d 1214, 1217–18 (3d Cir.1978).

After the complaint in this action was filed, the defendants filed their original motion to dismiss or stay the action pending a decision by the NRAB as to whether the June 8, 1995 strike was precipitated by valid safety concerns. On November 27, 1995, we denied the defendants' motion without prejudice. At that time, the defendants simply had submitted a conclusory affidavit stating that the Conway Yard was unsafe due to rats and that this condition existed both before the strike occurred and continued to exist thereafter. The defendants, however, omitted a crucial fact. Their affiant never stated that the June 8, 1995 strike was called *because of*

---

4. In its decision, the court described this board as the "Public Law Board," the "Adjustment Board," and the "National Railroad Adjustment Board." *See Springfield Terminal,* 767 F.Supp. at 335, 340, 343, 345. However, when discussing the pertinent administrative body, the court

unambiguously referred to 45 U.S.C. § 153. That statute sets out the powers of the NRAB. It is clear that, whatever the appellation, the *Springfield Terminal* court was discussing the powers of the NRAB or some division thereof.

these unsafe conditions. As the workers returned to work only two hours after calling the strike, with conditions unchanged, this court had no reason to infer such a causal connection. It was hard to imagine that the union would disregard the protection of the FRSA and order its members back to work if the real concern was a hazardous condition presenting "an imminent danger of death or serious injury." 49 U.S.C. § 20109(b)(B)(i). Nonetheless, the defendants' current motion, filed after the conclusion of discovery, presents more specific facts. Regardless of its persuasiveness, we now have before us evidence that the strike was called over the hazardous rodent situation at the Conway Yard.

Conrail contends that even if deference to the NRAB were otherwise appropriate, it is not due in this case because the defendants have not satisfied certain procedural requirements of the FRSA. For example, Conrail asserts that the FRSA requires that the defendants attempt to resolve safety disputes through "regular statutory means" before they strike [5] and to notify Conrail of any hazardous condition before they stop working.[6] Conrail states that the defendants failed to meet either requirement and thus are barred from FRSA protection.

■ It is not for this court to weigh the conflicting evidence on whether the June 8, 1995 strike was called for legitimate safety reasons or whether those reasons were merely pretextual. Nor is it our role at this point to determine whether all conditions of the FRSA have been met. Rather, it is for the NRAB to decide whether the defendants have stated and proved a valid dispute under the various provisions of the FRSA. *See Lenfest,* 799 F.2d at 800; *see also Union Pacific R.R. v. Sheehan,* 439 U.S. 89, 99 S.Ct. 399, 58 L.Ed.2d 354 (1978). As the Supreme Court has noted, when a contract or statute refers disputes to an arbitration board, "[t]he agreement is to submit all grievances to arbi-

tration, not merely those that a court may deem to be meritorious." *United Steelworkers of America v. American Mfg. Co.,* 363 U.S. 564, 567, 80 S.Ct. 1343, 1346, 4 L.Ed.2d 1403 (1960); *see also United Steelworkers of America v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 584–85, 80 S.Ct. 1347, 1353–54, 4 L.Ed.2d 1409 (1960). Such deference remains appropriate when some threshold issues are unresolved. For example, in the recent Supreme Court decision of *Vimar Seguros y Reaseguros v. M/V Sky Reefer,* —— U.S. ——, 115 S.Ct. 2322, 132 L.Ed.2d 462 (1995), the petitioner argued that a federal court must determine what law applies to a particular arbitration provision before referring the action to the arbitrators. The Supreme Court disagreed, holding that the choice-of-law decision is itself a matter for the arbitrators, not the court. *Id.* at —— —— ——, 115 S.Ct. at 2329–30.

■ For present purposes, we must assume that the defendants' factual presentation is true. On that basis, we conclude that the defendants now have made a sufficient showing to require this court to defer to the NRAB. The NRAB must determine whether the defendants have satisfied the conditions for invoking the FRSA and, if so, whether the June 8, 1995 strike was justified by a hazardous condition which presented "an imminent danger of death or serious injury." 49 U.S.C. § 20109(b)(B)(i). Though we decline to dismiss the entire action, we will stay further disposition of this case pending the outcome of NRAB proceedings. In doing so, we emphasize that the strike is concluded. We are not faced with a situation where the court must act speedily to prevent irreparable harm.

Once the NRAB has made its decision, which it must do within 180 days,[7] we can proceed with the case. Conrail's request for a permanent injunction to rectify an alleged pattern and practice of illegal behavior by

---

5. Title 49 U.S.C. § 20109(b)(B)(ii) provides that workers may not cease working unless "the urgency of the situation does not allow sufficient time to eliminate the danger through regular statutory means."

6. Title 49 U.S.C. § 20109(b)(C) states that the "employee, where possible, [should] notif[y] the carrier of the hazardous condition and the intention not to perform further work unless the condition is corrected immediately."

7. 49 U.S.C. § 20109(c).

the defendants will be considered at that point. As the June 8, 1995 strike is one of a number of strikes at the Conway Yard which allegedly constituted an illegal pattern and practice, we cannot adequately address Conrail's injunction request until the NRAB has had an opportunity to consider this incident. Once we have reviewed the NRAB's decision, we will also deal with Conrail's claim for damages.[8] 45 U.S.C. § 153(p)–(q). If after review of the NRAB's ruling the court finds that the defense under the FRSA was frivolous or otherwise improper under Rule 11 of the Federal Rules of Civil Procedure, the court, of course, may impose the appropriate sanctions.

Accordingly, we will deny the defendants' motion to dismiss the second amended complaint but will grant their motion for a stay. We will also deny Conrail's cross-motion for partial summary judgment.

## ORDER

AND NOW, this 19th day of November, 1996, for the reasons set forth in the accompanying Memorandum, it is hereby ORDERED that:

(1) the renewed motion of defendants to dismiss the amended complaint is DENIED;

(2) the renewed motion of defendants to stay this action is GRANTED pending a decision by the National Railroad Adjustment Board ("NRAB") with respect to the reasons and justification for the June 8, 1995 strike at the Conway Yard and defendants' compliance with the Federal Railroad Safety Act. *See* 49 U.S.C. § 20109 and 45 U.S.C. § 153. The parties shall advise this court promptly of any decision by the NRAB. If the defendants fail to present the above issues to the NRAB within 15 days of this Order, the court will deem the issues waived, and it will vacate its Order for a stay; and

(3) the cross-motion of plaintiff for partial summary judgment is DENIED.

---

**8.** In a prior decision, this court ruled that the RLA permits a claim for damages incurred from an illegal strike over a minor dispute. *Consolidated Rail Corp. v. United Transp. Union, Gen. Comm. of Adjustment, et al.,* 908 F.Supp. 258 (E.D.Pa.1995).